2008 ME 100

**James P. MOORE**

v.

**Charles ABBOTT et al.**

Supreme Judicial Court of Maine.

Submitted On Briefs: Jan. 24, 2008.
Decided: June 17, 2008.

Seth D. Harrow, Esq., Vafiades, Brountas & Kominsky, LLP, Bangor, ME, for The Honorable Euguene Beaulieu and Marvin Glazier, Esq.

Sigmund D. Schutz, Esq., Preti Flaherty Beliveau & Pachios, LLP, Portland, ME, Zachary Heiden, Esq., Maine Civil Liberties Union Foundation, Portland, ME, for amicus curiae Maine Civil Liberties Union.

Panel: ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: ALEXANDER, SILVER, and GORMAN, JJ.

Dissent: LEVY and MEAD, JJ.

ALEXANDER, J.

[¶ 1] James P. Moore appeals from a judgment of the Superior Court (Cumberland County, *Crowley, J.*) that denied his appeal from the failure of individual members of an advisory group created by the Attorney General to provide Moore certain documents in response to his Freedom of Access Act request. Moore's action was brought pursuant to 1 M.R.S. § 409(1) (2007) and M.R. Civ. P. 80(C). Moore contends that the individual members of an advisory group created by the Attorney General constituted an "agency or public official" of the State, 1 M.R.S. § 402(3) (2007), whose records are subject to inspection and disclosure pursuant to 1 M.R.S. § 408(1), (2) (2007). We affirm the judgment.

## I. CASE HISTORY

[¶ 2] In 1989, Dennis J. Dechaine was convicted of the kidnapping, sexual assault, and murder of a twelve-year-old girl. We affirmed the conviction. *State v. Dechaine,* 572 A.2d 130 (Me.1990). Following our opinion, Dechaine filed a motion for a new trial. After hearing, the trial court denied the motion. We affirmed. *State v.*

James P. Moore, Brunswick, ME, pro se.

John B. Cole, Esq., Skelton, Taintor & Abbott, P.A., Auburn, ME, for Charles Abbott, Esq.

*Dechaine,* 630 A.2d 234 (Me.1993). Our 1990 and 1993 opinions discussed, in extensive detail, the procedural history of the case and the substantial evidence supporting the convictions. Because the procedural history and evidentiary record of the case is discussed in our prior opinions, it is not repeated here.

[¶ 3] For some time, a group of Dechaine's friends and supporters have been actively involved in accusing the Attorney General's office and law enforcement agencies who investigated the crimes of various improprieties in the investigation and prosecution of the crimes. In 2004, the Attorney General expressed concern that, although he believed the accusations to be untrue, the persistence of the accusations could affect public confidence in State law enforcement agencies. The Attorney General attempted to address these concerns by requesting three experienced attorneys to independently review the investigation and prosecution of the crimes and the alleged improprieties and provide a report to him of the results of their investigation. To accomplish this objective, the Attorney General asked Eugene Beaulieu, a former state judge and federal magistrate judge, and two other experienced attorneys, Charles Abbott and Marvin Glazier, to conduct an independent review of the validity of the allegations of improprieties. The Attorney General wrote a letter to each of the three requesting that they "conduct an independent and impartial review of these allegations and provide to me a report of your findings, which will be made public." To support this review, the Attorney General pledged the cooperation of his office, including making available the personnel who were involved in the prosecution and investigation of the crimes and public documents related to the prosecution.

[¶ 4] The three attorneys received no compensation for their work, and their administrative activities were supported principally by the office of one of the attorney members of the committee. The interviews the three conducted were held at the Attorney General's office, and, on one occasion, the Attorney General arranged for a retired law enforcement officer to be transported to a meeting with the advisory committee. Based on the record before it, the Superior Court found that "other than describing the scope of the review and providing the cooperation of his office, the Attorney General had no involvement with how [the defendants] conducted their review."

[¶ 5] In 2006, the three attorneys issued their report, concluding that there was no merit to the allegations of prosecutorial or law enforcement misconduct relating to investigation or prosecution of the case.

[¶ 6] After the report was issued, Moore sent letters to the three attorneys presenting a Freedom of Access Act request to review the files, records, and reports compiled during their independent review. When the first letter received no response, Moore sent a second letter making a similar request. After receiving no response to the second letter, Moore filed a Freedom of Access Act action in the Superior Court, seeking an order that the three individuals provide any materials relating to the independent review that were within their possession or control. The Superior Court action and this appeal have been directed to the three individual attorneys who conducted the independent review. At no time has the Attorney General or a representative of any law enforcement agency appeared, or otherwise participated, in the Superior Court action or this appeal.

[¶ 7] The three attorneys responded to Moore's action in Superior Court, asserting that they did not constitute a State agency or public official subject to the requirements of the Freedom of Access Act. After a hearing, the Superior Court agreed, concluding that the three individual attorneys "are not a public agency or political subdivision and need not turn over documents related to their independent investigation into the prosecution of Dennis Dechaine to petitioner pursuant to his FOAA request." From that decision, Moore brought this appeal.

## II. LEGAL ANALYSIS

[¶ 8] Maine's Freedom of Access Act gives every person "the right to inspect and copy any public record during the regular business hours of the agency or official having custody of the public record." 1 M.R.S. § 408(1). "Public records" is broadly defined as

> any written, printed or graphic matter ... that is in the possession or custody of an agency or public official of this State ... and has been received or prepared for use in connection with the transaction of public or governmental business or contains information relating to the transaction of public or governmental business.

1 M.R.S. § 402(3).

[¶ 9] This appeal presents the question of whether, when State officials, acting without a legislative mandate, seek non-binding and uncompensated advice about official business from a designated group of private citizens, the records gathered or created by those citizens, individually or collectively, become public records because those citizens are the functional equivalent of a State agency or public official, for purposes of application of the Freedom of Access Act. *See, Town of Burlington v.*

*Hosp. Admin. Dist. No. 1*, 2001 ME 59, ¶ 16, 769 A.2d 857, 862–63.

[¶ 10] In evaluating whether an entity or individual, individually or collectively, qualifies as "an agency or public official" for purposes of the Freedom of Access Act, we look to "the function that the entity performs." *Dow v. Caribou Chamber of Commerce & Indus.*, 2005 ME 113, ¶ 12, 884 A.2d 667, 670 (quoting *Town of Burlington*, 2001 ME 59, ¶ 16, 769 A.2d at 862–63).

[¶ 11] We have established a four-part test, applying this functional analysis, to determine if a particular entity or citizen, individually or collectively, as a result of activities relating to government, becomes "an agency or public official" for purposes of the law. The four factors are:

(1) Whether the entity is performing a governmental function;

(2) Whether the funding of the entity is governmental;

(3) The extent of governmental involvement or control; and

(4) Whether the entity was created by private or legislative action.

*Id.; Town of Burlington*, 2001 ME 59, ¶ 16, 769 A.2d at 862–63. We have indicated that although these factors should be considered and weighed, an entity need not strictly conform to each factor to become a public agency or public official. *Dow*, 2005 ME 113, ¶ 12, 884 A.2d at 670.

[¶ 12] There is no serious factual dispute about the history of the creation, actions, and nonbinding report of the informal advisory group in this case. It had no legislative authorization. It received no State funds. Its members acted solely as private citizens. Its activities were supported principally by the office of one of the attorney members of the group. The Attorney General assisted the group only by making available documents for review

and witnesses to interview. The report was not binding on the Attorney General. The Attorney General played no role in drafting the report, and the Attorney General is not participating in this appeal.

[¶ 13] In essence, the three individuals conducting the independent investigation were like many other individuals and groups who provide solicited advice to State officials that is nonbinding and without legislative authorization or State payment for the value of services or expenses. While the individuals here provided collective advice regarding the Attorney General's action in prosecution of a crime, their functions were really no different than other groups and individuals who provide advice on a wide range of topics from ways to cut costs and improve efficiency, to ways to improve the economy, to recommendations for appointment of qualified individuals to public positions. After reviewing the facts in light of the four factors derived from our precedents, the Superior Court found that "all four *Dow* factors weigh against classifying [the defendants] as a public agency or political subdivision...."

[¶ 14] Our review of those factors confirms the accuracy of the Superior Court's decision.

A. Performing a Governmental Function

[¶ 15] The three attorneys in this case were asked by the Attorney General to conduct an independent investigation and to report the results of their investigation to the Attorney General, with the results to be made public. The advice to be provided through the investigation report was nonbinding, and no recommendations were requested on any issue. The group had no authority to charge, prosecute, or sanction any misconduct it might have found. The Attorney General could treat the report as he wished. In this action, the three private citizens were not performing a governmental function. A person or entity, acting without statutory authority or state support, who provides nonbinding advice to a state agency or state official, even on a matter that may be of some significance, does not, by providing that nonbinding advice, become an agent of government performing a governmental function for purposes of application of the Freedom of Access Act.

[¶ 16] State government practice has not treated such informal advisory groups, either individually or collectively, as "an agency or public official" subject to the Freedom of Access Act. Title 1 M.R.S. § 402(2)(F) (2007) lists the categories of advisory groups or organizations whose activities are "public proceedings" subject to the law. The covered entities identified in section 402(2)(F) are "[a]ny advisory organization ... established, authorized or organized by law or resolve or by Executive Order issued by the Governor...." The Attorney General's informal advisory group was not created by law, by legislative resolve, or by Executive Order of the Governor. It is not in the categories listed in the law, and it was not performing a governmental function to subject it to the law.

B. Government Funding

[¶ 17] The three attorneys received no pay and no government financial support in conducting their independent investigation. They only received incidental logistical support from the Attorney General's office in arranging interviews of those persons they wished to interview. In effect, the investigation and its administrative costs were self-funded by the three defendants.

C. Government Involvement or Control

[¶ 18] The request to the three attorneys, by the Attorney General, was to

conduct an independent investigation free of government involvement or control. In support of the investigation, the Attorney General did provide the three attorneys copies of the criminal and investigative records that were already part of the public record and helped to arrange interviews with people who the defendants, collectively, decided to interview. However, beyond such incidental logistical support, the Attorney General, by design, had no involvement with or control of the investigation. There is no indication that the Attorney General made or attempted to make any effort to limit the extent or scope of the investigation, its timing, its evidence development process, the choices of persons to be interviewed, or any other aspect of the defendants' activities leading to preparation of their report. Accordingly, the governmental involvement or control factor we addressed in *Dow* weighs against determining that the defendants acted as a public agency or public official.

## D. Created by Private or Legislative Action

[¶ 19] In this case, there was no legislative mandate or any other statute, Executive Order, or other official authorization for the three attorneys to conduct the independent investigation. This lack of official legislative or executive authorization distinguishes this case from *Lewiston Daily Sun, Inc. v. City of Auburn*, 544 A.2d 335 (Me.1988). There, over two dissents, we held that the open meetings' provisions of the Freedom of Access Act applied to a committee created at the express direction of the city council to investigate and make recommendations regarding wrongdoing in city government. *Id.* at 336–38. No such legislative mandate or direction to investigate and make recommendations exists here. There was no Executive Order of the Governor or other official action creating this advisory group.

[¶ 20] In this case, all that existed was a letter from the Attorney General requesting that the three attorneys conduct an independent investigation and provide to him a nonbinding advisory report. Essentially, the defendants were requested, not mandated, to perform the investigation, and they were asked to do it as independent private citizens, separate from the government and without being requested or expected to make any recommendations. The advisory group was not created by legislative action or even by Executive Order to bring it within the criteria we outlined in *Dow*.

[¶ 21] Having reviewed the facts of this case against criteria we have previously established, we agree with the Superior Court's finding that all four of the criteria for distinguishing whether an activity is undertaken by a public agency or private citizens support the determination that, in this case, the defendants acted as private citizens in conducting an independent investigation and giving nonbinding advice to the Attorney General. Therefore, the document disclosure mandates of the Freedom of Access Act do not apply to any documents generated in the course of their independent investigation that may be in the defendants' possession.

The entry is:

Judgment affirmed.

LEVY, J., with whom MEAD, J., joins, dissenting.

[¶ 22] I respectfully dissent because I believe that the functional equivalency analysis requires us to conclude that the records of the investigatory panel organized by the Attorney General are subject to the Freedom of Access Act, 1 M.R.S. §§ 401–412 (2007).

## A. Functional Equivalency Analysis

[¶ 23] To determine whether a private entity qualifies as a public agency under the Freedom of Access Act, we employ the four-part functional equivalency test developed by the Connecticut Supreme Court. *See Town of Burlington v. Hosp. Admin. Dist. No.1*, 2001 ME 59, ¶ 16, 769 A.2d 857, 862–63 (citing *Conn. Humane Soc'y v. Freedom of Info. Comm'n*, 218 Conn. 757, 591 A.2d 395, 397 (Conn.1991)). This test requires us to consider: (1) whether the entity performs a governmental function; (2) whether the government funds the entity; (3) the extent of governmental involvement or control; and (4) whether the government created the entity. *Id.* ¶ 16, 591 A.2d 395, 769 A.2d at 863; *Conn. Humane Soc'y*, 591 A.2d at 397; *see also Dow v. Caribou Chamber of Commerce & Indus.*, 2005 ME 113, ¶ 12, 884 A.2d 667, 670 (quoting verbatim the test outlined in *Town of Burlington*). An entity need not strictly conform to each factor. Instead, "[a]ll relevant factors are to be considered cumulatively, with no single factor being essential or conclusive." *Ry. Labor Executives' Ass'n v. Consol. Rail Corp.*, 580 F.Supp. 777, 778 (D.D.C.1984).

### 1. Performing a Governmental Function

[¶ 24] The investigatory panel organized by the Attorney General was clearly performing a traditional government function-the internal investigation of allegations of prosecutorial and law enforcement misconduct. The fact that an investigation is conducted through an outside source does not necessarily change the public nature of the investigation. *See Cyr v. Madawaska Sch. Dep't*, 2007 ME 28, ¶¶ 3–4, 12, 916 A.2d 967, 969, 971 (holding that an outside investigation of a school matter did not make portions of the resulting report any less a confidential employee evaluation); *Lewiston Daily Sun, Inc. v. City of Auburn*, 544 A.2d 335, 335–36 (Me.1988) (finding an independent, volunteer investigatory committee subject to the Act). In reaching the opposite conclusion, the Court minimizes several pertinent facts.

[¶ 25] Before creating the panel, the Attorney General's office discussed whether there was any effective way to conduct an independent review within the state government of the alleged misconduct in the Dechaine case and eventually concluded there was not. The Attorney General asked a jurist and two private attorneys, rather than his own staff of attorneys and investigators, to conduct this investigation "in order to ensure continued public confidence" in the state's law enforcement agencies. To facilitate this internal investigation, the Attorney General not only provided the panel access to his entire file in the matter, portions of which are explicitly designated confidential by the Legislature,[1] but also ordered the personnel involved in the Dechaine prosecution to cooperate in the panel's investigation. Given the panel's unfettered access to interview, at its discretion, the prosecutors and investigators involved in the prosecution of a high profile murder case, the panel was afforded a truly unique window through which to view and assess the inner workings of the Attorney General's Department, a view that is otherwise not available to private interest groups or the public.

[¶ 26] Because an investigation initiated by the Attorney General of the internal workings of his staff in connection with a specific prosecution is a core function of

---

1. The Legislature, in creating an exception for this case to the pre–1995 exception to 16 M.R.S. § 614 (2007), explicitly left certain aspects of the file confidential and not subject to release under section 614. *See* P. & S.L. 2003, ch. 18.

his office, the first criterion of the functional equivalency analysis weighs in favor of finding that the panel was performing a governmental function. The Court reaches the opposite conclusion, focusing its analysis of the first criterion on the manner by which the investigatory panel was created. I disagree with this approach for two reasons.

[¶ 27] First, the government's role in the creation of the entity is a separate criterion—the fourth—of the functional equivalency test. The Court's approach conflates the first and fourth criteria, resulting in the same facts being considered twice.

[¶ 28] Second, the Court's analysis improperly focuses on the limitations on the statutory term "public proceedings," 1 M.R.S. § 402(2)(F), as part of its analysis in a case involving "public records," 1 M.R.S. § 402(3). We have long recognized that the Legislature has decoupled the term "public proceedings" from "public records." *See Moffett v. City of Portland,* 400 A.2d 340, 341 n. 4 (Me.1979) (describing the statutory evolution of the term "public records" and its expansion beyond merely the records and minutes of public proceedings). Furthermore, "[t]he Legislature has declared that the [Freedom of Access Act] 'shall be liberally construed and applied to promote its underlying purposes and policies'" and we therefore strictly construe all statutory exceptions to public disclosure. *Cyr,* 2007 ME 28, ¶ 8, 916 A.2d at 970 (quoting 1 M.R.S. § 401). The limitations regarding advisory groups contained in the statutory definition of "public proceedings," are not repeated in the list of statutory exemptions to the definition of "public records." *See* 1

M.R.S. § 402(2), (3). Accordingly, these limitations do not control our interpretation of "public records" and the Court's use of these exemptions to narrow the scope of "public records" runs contrary to both the statutory text and legislative intent. *See* 1 M.R.S. § 401.[2]

2. Government Funding

[¶ 29] The manner in which the investigation was financed, on the other hand, weighs against a finding that the panel qualifies as a government agency under the Act. The panel members received no compensation for their activities, and the law firm of one of the members funded the panel's administrative costs. The Attorney General's Department otherwise provided only incidental, logistical support in arranging interviews of those persons the panel wished to interview.

3. The Extent of Government Involvement or Control

[¶ 30] The extent of government involvement or control criterion weighs in favor of finding the panel acted as a public agency. Although the Attorney General provided only incidental, logistical support and, once formed, the panel acted independently of his control, the Attorney General delineated the scope of the panel's work. The Court's analysis, in my view, minimizes key facts regarding this criterion.

[¶ 31] In his October 23, 2004, letter formalizing the panel members' appointments, the Attorney General identified five specific allegations and instructed them that, "[y]ou are asked to investigate these [five specific] allegations only" and instructed them to report their findings di-

---

2. As we stated in *Town of Burlington v. Hospital Administrative District No. 1,* 2001 ME 59, ¶ 14 n. 7, 769 A.2d 857, 861: "Although the list of these entities is not directly applicable to this case because this case concerns records, not proceedings, the list is illustrative of the breadth of organizations covered by [the Freedom of Access Act]."

rectly to him.[3] After completing its review, the panel did not release the report to the general public. Instead, it followed the Attorney General's instructions and provided the report to him directly. The Attorney General later released the report himself.

[¶ 32] The panel acknowledged the Attorney General's control over the scope of its investigation in its letter detailing its findings:

Our sole purpose was to investigate the allegations detailed above, and to advise you, after our independent review, whether we found any of the allegations made against your office or law enforcement officers had any substantive merit.

[¶ 33] Prior to adopting our present functional equivalency analysis, we addressed the application of the Freedom of Access Act to a volunteer investigatory committee created by a city council and mayor in *Lewiston Daily Sun, Inc. v. City of Auburn*, 544 A.2d 335 (Me.1988). In concluding that the Act applied to the committee, we focused in part on the substantial links between the committee and the mayor. *Id.* at 338. Like the Attorney General, the mayor created the committee, charged it to investigate a particular issue, and asked the committee to provide him with a recommendation. *Id.* Although the mayor recommended that the committee interview certain individuals, he told the committee that it could interview whomever it pleased. *Id.*

[¶ 34] As with the mayor in *Lewiston Daily Sun*, the Attorney General exercised no direct control over the panel during the course of its investigation. He did, however, exercise substantial control over the panel's formation, its composition, its access to departmental resources, the scope of its inquiry, and the distribution of its findings. Therefore, this factor weighs in favor of a positive finding that the panel acted as a public agency.

### 4. Created by The Government

[¶ 35] Finally, the fourth criterion—whether the government created the entity—weighs in favor of finding that the panel acted as a public agency. Although we previously described this criterion as an inquiry into whether the entity was "created by private or legislative action," see *Town of Burlington*, 2001 ME 59, ¶ 16, 769 A.2d at 863, the functional equivalency test is not so narrow. The decisions from other jurisdictions on which we have relied in describing the functional equivalency test establish that the fourth criterion is "whether the entity was created by the government," not simply whether the entity owes its existence to legislative action. *See Conn. Humane Soc'y*, 591 A.2d at 397, cited in *Town of Burlington*, 2001 ME 59, ¶ 16, 769 A.2d at 863; *Telford v. Thurston County Bd. of Comm'rs*, 95 Wash.App. 149, 974 P.2d 886, 893 (1999).

---

3. The five allegations are as follows:
   - Following their initial investigation, law enforcement officers altered their notes and/or reports to falsely attribute incriminating statements to Dennis Dechaine.
   - Prosecutors misled the jury with respect to [the victim's] time of death.
   - At the time of trial, prosecutors and law enforcement officers had information about an alternative suspect which they should have shared, but did not share, with defense counsel.
   - In 1992, law enforcement officers, with the approval of prosecutors, inappropriately destroyed physical evidence including a rape kit as well as hairs and fibers discovered at the scene where [the victim] was found.
   - Prosecutors inappropriately failed to notify the court and defense counsel of a consultant's opinion regarding the reliability of an outside laboratory and DNA tests conducted in 1993.

[¶ 36] This broader understanding of the fourth criterion is necessary because the Freedom of Access Act is not restricted to entities created by legislation. *See* 1 M.R.S. § 402(2)(F) (defining "public proceedings" subject to the Freedom of Access Act as including "[a]ny advisory organization ... established ... by Executive Order issued by the Governor"); 1 M.R.S. §§ 402(3), 412(4) (establishing that the Act applies to various public officials, including constitutional officers not created by legislative action). Although the Court describes its analysis as an examination of whether the entity at issue was created by "legislative action," it proceeds to expand the scope of its inquiry into whether there has been an "Executive Order of the Governor" or other "official action." *See supra* ¶ 1.

[¶ 37] In this instance, although there was no legislative mandate, the panel was clearly created by official governmental action. The Attorney General, a constitutional officer acting in his official capacity, conceived of the idea of an independent investigatory panel, appointed its members, delineated the scope of its work, and provided it unfettered access to his staff.

5.  Balancing of the Four Factors

[¶ 38] Of the four factors, three support the conclusion that the panel is subject to the Freedom of Access Act. The second factor, which requires us to consider the manner in which the panel was funded, weighs against a positive finding. Nevertheless, the voluntary nature of the panel and the absence of governmental financial support is not dispositive of the matter because although all four factors must be "considered and weighed, an entity need not strictly conform to each of the factors." *Dow*, 2005 ME 113, ¶ 12, 884 A.2d at 670 (quotation marks omitted). Numerous boards, commissions, and committees of this State receive no financial compensation for their public service but may be subject to the Freedom of Access Act. *See* 5 M.R.S. § 12004–I (2007) (listing various statutorily created boards for which compensation is not authorized).

[¶ 39] I am ultimately persuaded by the circumstances presented to give the greatest weight to the first factor—whether the entity performed a governmental function—because of the unique nature of the governmental function the panel performed. *See Portland Water Dist. v. Town of Standish*, 2006 ME 104, ¶ 23, 905 A.2d 829, 835–36 (finding a water district to be a governmental entity due in part to its "uniquely governmental functions"). The power to prosecute rests exclusively with the State and is a core function of sovereign authority. *See United States v. Lara*, 541 U.S. 193, 197–98, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004). Any investigation into the exercise of that power initiated by the Attorney General, Maine's chief law enforcement officer, is necessarily a derivative expression of this unique authority. In this case, the panel's investigation sprang directly from the Attorney General's exclusive responsibility for the "direction and control of all investigations and prosecution of homicides," 5 M.R.S. § 200–A (2007). The fact that three volunteers appointed by the Attorney General conducted the investigation, and not paid, professional members of his department, offers no rational basis to diminish the public's right, pursuant to the Freedom of Access Act, to seek access to the materials resulting from the investigation.

B.  Conclusion

[¶ 40] Measured against our previously established criteria, the undisputed facts lead to the conclusion that the panel acted as an arm of the Department of the Attorney General. All materials generated in

the course of the panel's investigation, not otherwise covered by an exception, *see, e.g.,* 5 M.R.S. § 7070(2) (2007); 16 M.R.S. § 614 (2007); 30–A M.R.S. § 2702(1)(B)(5) (2007), should be subject to the Freedom of Access Act. The panel and its members therefore should be obligated to respond to Moore's request pursuant to 1 M.R.S. § 409(1).