

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 1 2 2017

CHIEF JUSTICE

This opinion was filed for record

at 8:00am on Jan 12, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| ALYNE FORTGANG, | NO. 92846-1 |
| Petitioner, | EN BANC |
| v. | |
| WOODLAND PARK ZOO a/k/a WOODLAND PARK ZOOLOGICAL SOCIETY, | Filed    JAN 1 2 2017 |
| Respondent. | |

GORDON McCLOUD, J.—Petitioner Alyne Fortgang filed a request for documents concerning the elephants at the Woodland Park Zoo (Zoo). She filed that request under the Public Records Act (PRA), chapter 42.56 RCW, which requires every government "agency" to make records "available for [public] inspection and copying." RCW 42.56.010, .040. But she filed it with the Woodland Park Zoo Society (WPZS), the private nonprofit that runs the Zoo. WPZS argues that the PRA can never reach the records of such a private entity.

We disagree. The PRA is "a strongly-worded mandate for open government," *Rental Hous. Ass'n of Puget Sound v. City of Des Moines*, 165 Wn.2d 525, 527, 199 P.3d 393 (2009), that "must be 'liberally construed . . .' to ensure that the public's interest [in broad disclosure] is protected," *Yakima County v. Yakima Herald-Republic*, 170 Wn.2d 775, 791, 246 P.3d 768 (2011) (quoting RCW 42.45.030). Our Court of Appeals has therefore interpreted the statutory word "'agency'" to include private entities when they act as the functional equivalent of government agencies. In *Telford v. Thurston County Board of Commissioners*, 95 Wn. App. 149, 162-63, 974 P.2d 886 (1999), Division Two of the Court of Appeals adopted a four-factor test to determine whether a private or quasi-private entity is an "'agency'" for purposes of the PRA.[1] The other two divisions later adopted that "*Telford* test."[2]

---

[1] *Telford* applies the Public Disclosure Act (PDA), former chapter 42.17 RCW (2004), the statute into which the PRA was originally incorporated. 95 Wn. App. 149. In 2005, the PRA portion of the PDA was renamed and recodified as a distinct chapter under the RCW, but it was not otherwise changed. *See* former ch. 42.17 RCW, *recodified as* ch. 42.56 RCW (LAWS OF 2005, ch. 274, effective July 1, 2006). Thus, in *Worthington v. WestNET*, 182 Wn.2d 500, 506 n.4, 341 P.3d 995 (2015), we explained that "there is no substantive difference" between the PRA and the PDA, and cases interpreting one act are generally relevant to the interpretation of the other. Accordingly, we treat the terms PRA and PDA as interchangeable.

[2] *Cedar Grove Composting, Inc. v. City of Marysville*, 188 Wn. App. 695, 716-20, 354 P.3d 249 (2015) (Division One); *Clarke v. Tri-Cities Animal Care & Control Shelter*, 144 Wn. App. 185, 192, 181 P.3d 881 (2008) (Division Three).

The *Telford* test—which derives from case law interpreting the federal Freedom of Information Act (FOIA)[3]—furthers the PRA's purposes by preventing governments from evading public oversight through creative contracting. 5 U.S.C. § 552; *see Cedar Grove Composting, Inc. v. City of Marysville*, 188 Wn. App. 695, 720, 354 P.3d 249 (2015). It is consistent with related precedent from this court and with the approach taken by numerous other jurisdictions interpreting similar transparency laws. We now hold that the *Telford* test is an appropriate way to decide whether a private entity must comply with PRA disclosure requirements.

Under the *Telford* analysis, WPZS is not the functional equivalent of a government agency. We therefore affirm the Court of Appeals.

## FACTS

WPZS was formed in 1965 as a private nonprofit organization. Its articles of incorporation state that its "object and purposes"

> shall be to promote public interest in and to encourage greater understanding of international wildlife and to promote its conservation and propagation in the modern world; to support and stimulate interest in all aspects of the Woodland Park Zoological Gardens at Seattle, Washington, and to motivate programs in keeping with educational,

---

[3] Our Court of Appeals adopted the *Telford* test from the Connecticut Supreme Court, which in turn derived it from federal case law interpreting the FOIA. *Telford*, 95 Wn. App. at 161-63 (citing *Bd. of Trs. of Woodstock Acad. v. Freedom of Info. Comm'n*, 181 Conn. 544, 553-55, 436 A.2d 266 (1980)).

3

scientific and aesthetic interests; [and to manage money and other property toward those ends].

Clerk's Papers (CP) at 177. At the time WPZS was incorporated, the city of Seattle (City) was operating the Zoo and all zoo employees were city employees.

Since its formation, WPZS has been governed by a volunteer Board of Directors (Board). There are currently 38 board members.

In 2000, the legislature passed RCW 35.64.010 and .020, which authorized certain cities (specifically Seattle and Spokane) to contract with nonprofits "for the overall management and operation of a zoo, an aquarium, or both" and imposed certain restrictions on those contracts. LAWS OF 2000, ch. 206; FINAL B. REP. ON ENGROSSED S.B. 6858, 56th Leg., Reg. Sess. (Wash. 2000). One provision in the law gives a contracting nonprofit the authority to manage, hire, and fire any city employees "employed in connection with the zoo or aquarium[,] . . . [n]othwithstanding any provision in the [contracting city's] charter." RCW 35.64.010(4). Another requires that any covered contract be adopted or amended only after a public hearing. RCW 35.64.010(2). In November 2000, the City approved a "Neighborhood Parks, Green Spaces, Trails and Zoo levy lid lift," which increased funding for the Zoo. CP at 34.

4

Partly in response to these developments, but also to address the Zoo's growing size and complexity, in March 2002 WPZS entered into an "Operations and Management Agreement" (Agreement) with the City, allowing WPZS to "provide for the management . . . of the entire Zoo operation." CP at 210-12.

Pursuant to the Agreement, WPZS must "manage and operate the Zoo as a state-of-the-art zoo, consistent with the Long-Range Plan, with emphasis on the Zoo's scientific and educational purposes and programs." CP at 219. But WPZS maintains significant autonomy and discretion in doing so. It has authority to set admission charges, subject to the general requirement that the Zoo "remain accessible to individuals from all economic circumstances." CP at 224. WPZS may make such improvements and alterations to the Zoo as it deems necessary "in its reasonable discretion," although permanent fixtures become city property once installed. CP at 225. The Agreement gives WPZS exclusive rights and responsibilities regarding the care, sale, and purchase of the Zoo's animals, consistent with the Long-Range Plan and applicable federal, state, and local laws. And the Agreement gives WPZS authority to contract with other entities for the provision of services at the Zoo, as well as the authority to manage, hire, and fire all zoo employees.

The Agreement also contains several provisions addressing public oversight of the Zoo. The City may appoint three of the WPZS Board's 38 members. A city employee, the superintendent of the City's Department of Parks and Recreation (Superintendent), maintains a nonvoting seat on the Board. WPZS must submit an "Annual Report" summarizing the Zoo's operations and providing a financial accounting and an "Annual Plan" presenting the Zoo's one-year capital improvement plan and explaining any other proposed changes to the Superintendent. CP at 232. WPZS must maintain financial records and make these available to the City upon request, and it must maintain records relating to the management and veterinary care of the Zoo's animals and make these available to the public upon request. And for any major capital project at the Zoo, WPZS must establish "a process for public involvement that is consistent with the Parks Department's Public Involvement Policy." *Id.*

With respect to funding, the Agreement establishes a mix of public and private support. It provides that WPZS may apply for grants in the City's name, but also empowers the city council to reject the funds awarded if it wishes. The Agreement obligates the City to pay WPZS an "Operations Support" payment of five million dollars per year to start, increasing each year according to inflation, and a "Routine Maintenance Payment" of $500,000 per year. CP at 219-20. It also entitles WPZS

6

to $2.5 million annually, "or as much of that total as is actually received," as long as the 2000 levy lid lift remains in effect. CP at 221. It obligates WPZS to obtain independent audits every year to submit to the Superintendent. And it subjects WPZS to state audits, at the City's request, "of the use and application of all revenues, grants and fees, [and] all City funds, except for private fundraising activities and private donor information, received by WPZS during the current and preceding year, including Zoo operations and management." CP at 232. In 2013, just over half of WPZS's revenue came from private "[e]arned [r]evenue," i.e., ticket sales, membership dues, investments, etc. CP at 207. Another 23 percent came from private donations. Twenty-six percent came from public sources, 16 percent from the City specifically. The parties agree that the Zoo itself—as distinct from WPZS's broader programming—receives at most about 30 percent of its funding from public sources.

## PROCEDURAL HISTORY

On November 6, 2013, Fortgang sent a letter to the Zoo, requesting several categories of records, all pertaining to the Zoo's elephants. Her request consisted of eight specific questions. On December 20, 2013, the Zoo's director of Communications and Public Affairs responded to Fortgang's request. The response began by asserting that "WPZ[S] is a private company and based on our

Management Agreement with the City . . . only required to disclose animal records." CP at 27. It then went on to state that the Zoo would nevertheless disclose some of the records Fortgang requested because "we like to be as transparent as appropriate . . . despite any legal obligation." *Id.* Attached to the response were "[k]eeper notes and medical records" for three elephants and a budget detailing the Zoo's estimated annual cost of keeping elephants. *Id.* But in response to most of Fortgang's eight questions, the Zoo's letter asserted that the information requested was "not subject to a public disclosure request." *Id.*

Fortgang filed a lawsuit against WPZS in March 2012, alleging it violated the PRA by refusing to disclose the records she requested. The trial court granted WPZS's motion for summary judgment and dismissed the action on the ground that WPZS was not an agency subject to PRA disclosure requirements. The Court of Appeals affirmed. *Fortgang v. Woodland Park Zoo*, 192 Wn. App. 418, 421, 368 P.3d 211 (2016). We granted Fortgang's petition for review. *Fortgang v. Woodland Park Zoo*, 185 Wn.2d 1033, 377 P.3d 747 (2016).

## ANALYSIS

Washington's PRA requires "[e]ach agency, in accordance with public rules, [to] make available for public inspection and copying all public records . . . ." RCW 42.56.070(1). And it provides the following definition of "agency":

"Agency" includes all state agencies and all local agencies. "State agency" includes every state office, department, division, bureau, board, commission, or other state agency. "Local agency" includes every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency.

RCW 42.56.010(1).

As discussed above, our Court of Appeals has interpreted this definition expansively to include certain private entities. Under the *Telford* test, the factors relevant to deciding when a private entity is treated as the functional equivalent of an agency are (1) whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government involvement in the entity's activities, and (4) whether the entity was created by the government. *Clarke v. Tri-Cities Animal Care & Control Shelter*, 144 Wn. App. 185, 192, 181 P.3d 881 (2008) (citing *Telford*, 95 Wn. App. at 162). Courts applying the test consider whether "the criteria on balance . . . suggest that the entity in question is the functional equivalent of a state or local agency." *Id.*

In this case, the Court of Appeals applied the *Telford* test and concluded that WPZS is not subject to PRA disclosure requirements. Fortgang challenges that conclusion, arguing that WPZS is the functional equivalent of a local public agency under *Telford*. WPZS responds with two alternative arguments for affirmance.

9

First, it argues that we should repudiate the *Telford* test altogether and hold that the PRA applies only to actual government agencies; in the alternative—if we do not abandon the *Telford* test—WPZS argues that the Court of Appeals applied it correctly here.

Because this case presents both a question of statutory interpretation and a challenge to a summary judgment ruling, our review is de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015) ("We review summary judgment orders de novo, considering the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party." (citing *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998))); *Estate of Bunch v. McGraw Residential Ctr.*, 174 Wn.2d 425, 430, 275 P.3d 1119 (2012) (questions of statutory interpretation reviewed de novo).

I.  We adopt the *Telford* test and decline to limit its applicability to entities with "material government attributes"

WPZS contends that we should disavow the *Telford* analysis because the PRA can never apply to a private entity. WPZS makes three arguments supporting this theory.

First, it argues that the PRA's plain language makes it applicable only to government "agencies," which do not include private nonprofits. Second, WPZS

argues that *Telford* is unnecessary as a policy matter because to the extent that a government partners with a private organization, the records pertaining to the government's conduct vis-à-vis that organization will remain accessible through a PRA request filed with the partnering government agency itself. Finally, WPZS cites legislative history. It points out that in 2015, a bill was introduced and ultimately rejected that would have made the PRA applicable to private nonprofits that perform government functions and receive substantial government support. This bill also specifically proposed to make the PRA applicable to "[a] nonprofit corporation or other public organization managing and operating a zoo or aquarium pursuant to a contract or agreement authorized by chapter 35.64 RCW." H.B. 1425 § 4(2), 64th Leg., Reg. Sess. (Wash. 2015). WPZS argues that by rejecting this bill, the legislature impliedly rejected the *Telford* test and/or the PRA's applicability to nonprofit entities like the Zoo. None of these arguments are persuasive.

As noted above, courts construe the PRA liberally to further the public interest in broad disclosure. *Rental Hous. Ass'n*, 165 Wn.2d at 527; *Yakima Herald-Republic*, 170 Wn.2d at 791. Numerous states with transparency laws similar to our PRA use an identical test to determine whether an entity is the functional equivalent

11

of a government agency.[4] WPZS does not explain why, in spite of our liberal construction mandate, we should interpret the PRA so strictly—especially when states with equivalent statutes have employed a more liberal construction.

Nor are we persuaded by WPZS's policy or legislative history arguments. WPZS's assertion that a private entity's operations can be adequately scrutinized through a PRA request with the contracting government is not necessarily true. While a government agency *may* keep adequate records of a contracting entity's

---

[4] *E.g., Frederick v. City of Falls City*, 289 Neb. 864, 873-75, 857 N.W.2d 569 (2015) (employing identical test to determine whether an entity "is the functional equivalent of a city agency, branch, or department" for purposes of state transparency law); *Moore v. Abbott*, 2008 ME 100, ¶ 10, 952 A.2d 980 (employing identical test to determine whether an entity "qualifies as 'an agency or public official'" for purposes of state transparency law); *Oriana House, Inc. v. Montgomery*, 110 Ohio St. 3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 24 (employing identical test to determine whether an entity "is a 'public institution'" for purposes of state transparency law); *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.*, 87 S.W.3d 67, 77, 79 (Tenn. 2002) (employing identical test to determine whether an entity was "the functional equivalent of a government agency" for purpose of state transparency law); *Conn. Humane Soc'y v. Freedom of Info. Comm'n*, 218 Conn. 757, 759-60, 591 A.2d 395 (1991) (employing identical test to determine whether an entity is a "public agency" for purposes of state transparency law). Other states employ a test that is substantially similar. *Toomey v. City of Truth or Consequences*, 2012-NMCA-104, ¶¶ 16-26, 287 P.3d 364 (applying nine-factor "totality of the circumstances" test); *Marks v. McKenzie High Sch. Fact-Finding Team*, 319 Or. 451, 463-64, 878 P.2d 417 (1994) (applying six-factor functional equivalency test); *Consol. Edison Co. of N.Y., Inc. v. Ins. Dep't of N.Y.*, 140 Misc. 2d 969, 974-75, 532 N.Y.S.2d 186 (1988) (applying four-factor test that considers the status of the entity's employees instead of the entity's origin); *A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 38-39, 464 A.2d 1068 (1983) (entity was "an agency or instrumentality of the State" because it served a public purpose, its management was selected by state's insurance commissioner, it did not independently manage its affairs or enforce its regulations, and it had special tax and liability status).

12

activities, it is also possible for a government to contract with a private entity so as to evade PRA accountability—precisely what the *Telford* test is designed to prevent. *See, e.g., Cedar Grove Composting*, 188 Wn. App. at 720 (consulting firm was functional equivalent of city agency in part because city "direct[ed] and delegate[ed] [firm's] activities . . . with the express object of avoiding the reach of the PRA"). And the legislative history WPZS cites is ambiguous: the legislature's failure to codify the *Telford* analysis could indicate either disapproval of the analysis or satisfaction with the way courts are already applying it. Indeed, the fact that our legislature has never amended the PRA to address the *Telford* test, even though our courts have been applying it for over 15 years, suggests approval rather than disapproval.[5]

Additionally, while this court has never actually adopted the *Telford* test, we implicitly endorsed it in *Worthington v. WestNET*, 182 Wn.2d 500, 507-08, 341 P.3d 995 (2015). *Worthington* held that WestNET—"a multiagency, multijurisdictional drug task force" formed under the Interlocal Cooperation Act (ch. 39.34 RCW) and involving several Washington municipalities—could not determine in its own

---

[5] *Soproni v. Polygon Apt. Partners*, 137 Wn.2d 319, 327 n.3, 971 P.2d 500 (1999) (legislature's "failure to amend a statute following a judicial decision interpreting it indicates legislative acquiescence in that decision").

13

founding agreement that it was exempt from PRA requirements. *Id.* at 503. Instead, we held that courts must apply a *Telford*-like "practical analysis" to determine whether WestNET was an "agency" for purposes of the PRA. *Id.* at 508. In reaching that conclusion, we acknowledged *Telford*'s "'functional equivalency' analysis" and called it consistent with the PRA's liberal construction mandate. *Id.* at 507 (quoting *Clarke*, 144 Wn. App. at 192; *Telford*, 95 Wn. App. at 161). Although we held that the specific *Telford* factors were irrelevant where an entity was, like WestNET, "undisputedly . . . public rather than private," we directed the trial court on remand to consider several different factors, all of which were, like the *Telford* factors, aimed at determining whether exempting the defendant entity would frustrate the PRA's purposes. *Id.* at 508-09 & n.6. WPZS's argument in this case—that we should repudiate the *Telford* factors because the PRA applies only to government "agencies" and therefore expressly excludes private nonprofits—conflicts in principle with *Worthington*'s interpretation of the PRA.

Finally, we also reject the argument, advanced by two groups of amici,[6] that we should limit *Telford* rather than repudiate it altogether. These amici acknowledge

---

[6] SEIU Healthcare Northwest Training Partnership, Association of Washington Public Hospital Districts, Community Health Plan of Washington, Coordinated Care of Washington Inc., Planned Parenthood of the Great Northwest and the Hawaiian Islands,

14

that the PRA can sometimes apply to a nominally private entity (and thus their position is less extreme than WPZS's), but they contend that courts should apply the *Telford* factors only where an entity's public status is truly ambiguous. Essentially, these amici argue the inverse of this court's position in *WestNET*. Whereas the *WestNET* court observed that the entity at issue was "undisputedly . . . public rather than private," 182 Wn.2d at 508 n.6, amici in this case argue that an entity may be so clearly private in nature that no *Telford* analysis is required.

Amici may be correct that some entities are unambiguously private, but neither explains how we could determine that without applying the *Telford* factors or some substantially similar analysis. Amici cite *Spokane Research & Defense Fund v. West Central Community Development Ass'n*, 133 Wn. App. 602, 608, 137 P.3d 120 (2006), where the court purportedly held that the entity at issue was unambiguously private and therefore not subject to the PRA, and then applied the *Telford* factors only in dicta. But when the *Spokane Research* court held that it "need not apply *Telford*'s functional equivalent analysis," it did so on the basis of several *Telford*-like considerations:

> Unlike the *Telford* entities, the Association was not created to fulfill a legislative mandate. The Association does not make policy or legislate.

---

and Washington State Hospital Association (collectively Service Providers) and Washington State Association of Municipal Attorneys.

The Association does not execute law or regulate law. The Association does not adjudicate disputes. The Association is not controlled by elected or appointed county officials, and is not government audited, and its employees are not paid by a government or enjoy government health or retirement benefits. In short, the Association possesses no material governmental attributes or characteristics.

133 Wn. App. at 608. This reasoning substantially mirrors the *Telford* analysis: it considers the entity's function (not executing law or making policy), the amount of government control (none), the entity's origin (not created to fulfill a legislative mandate), and to some extent funding (no employees compensated by government). Thus, it does not conserve any analytical effort.

For the foregoing reasons, we hold that the Court of Appeals was correct to apply the *Telford* test in this case.

II.     Under the *Telford* test, WPZS is not the functional equivalent of a government agency for purposes of PRA disclosure requirements

In addition to the current case, there are four published Court of Appeals decisions applying the *Telford* factors. In three of those cases, the court concluded that the entity at issue was the functional equivalent of an "agency" subject to the PRA, at least with respect to certain documents and activities. *Telford*, which addressed two nonprofits formed for the purpose of administering county programs, held that all four factors weighed in favor of government agency status. 95 Wn. App. at 152-57. *Clarke* applied the factors to a privately run corporation that

16

contracted with the Tri-Cities area animal control authority to provide euthanasia services. 144 Wn. App. at 188. It held that three of the four factors—all but the entity's "origin"—weighed in favor of applying the PRA. *Id.* at 192-95. *Cedar Grove Composting* reached the same conclusion about a private company that provided consulting services to the city of Marysville. 188 Wn. App. at 716-20. Finally, *Spokane Research* held that all four factors weighed against applying the PRA to a private, neighborhood-based nonprofit (the association) that managed a community center. 133 Wn. App. at 604-05.

In this case, the Court of Appeals concluded that all four *Telford* factors weighed against applying the PRA. *Fortgang*, 192 Wn. App. at 421. WPZS agrees. It contends that the first factor weighs against applying the PRA because, in contrast to the entities at issue in *Telford* and *Clarke*, the Zoo does not perform any function unique or essential to government. Resp't WPZS's Suppl. Br. at 15-16. It contends that the second factor weighs against applying the PRA because "[n]o case has ever applied the PRA to an entity where public funding comprises less than a significant percentage [i.e., the majority] of the entity's total revenue." *Id.* at 16-17. It argues that the third factor weighs against PRA coverage because no government controls the day-to-day operations at the Zoo and that the fourth factor weighs against

coverage because WPZS was formed entirely by private citizens as a private organization. *Id.* at 17-18.

Fortgang disagrees with all of these assertions. Bearing in mind that the purpose of the *Telford* test is to determine whether, with respect to the particular defendant entity at hand, immunity from PRA requirements would frustrate the goal of government transparency, we address each factor and each of Fortgang's arguments in turn.

### A. *WPZS does not perform a government function under the first* Telford *factor*

Our Court of Appeals decisions describe the first *Telford* factor as looking for "core" government functions, *Clarke*, 144 Wn. App. at 194, or functions that could not be delegated to the private sector, *Telford*, 95 Wn. App. at 165. Fortgang acknowledges this, but she argues that this approach is too narrow; she focuses instead on whether the function at issue was delegated to the private entity via enabling legislation. She argues that legislation permitting the City to delegate management of the Zoo to WPZS limits the extent of the delegation and therefore resembles the legislation at issue in *Clarke* and *Telford*, where the private entity was found to have performed a public function.

18

We disagree with Fortgang's reading of *Clarke* and *Telford*. To the extent that those cases discuss enabling legislation, it is to point out that this legislation endowed the disputed entities with police or government administrative powers. *Clarke*, 144 Wn. App. at 193-94 (concluding that private nonprofit was statutorily defined as an "animal control agency," could enforce provisions of state's animal control services statute only through its contract with a county or city, and performed police powers function that implicated due process); *Telford*, 95 Wn. App. at 163-64 (numerous statutes imposed "'public' duties" on the entities at issue, and these duties "could not be delegated to the private sector"). Neither case holds that an entity performs a government function any time it contracts with the government pursuant to enabling legislation. Nor does case law from other jurisdictions support Fortgang's argument regarding enabling legislation. Like *Telford* and *Clarke*, out-of-state cases addressing enabling legislation tend to ask whether that legislation defines the "function" at issue as an inherently public one, which cannot be delegated to the private sector, and/or whether the enabling legislation actually *obligates* the entity at issue to perform that function.[7] And, like *Telford* and *Clarke*, most out-of-

---

[7] *E.g.*, *Frederick*, 289 Neb. at 866-67 (nonprofit, which was formed exclusive for the purpose of promoting economic development in municipality, performed a "government function" that was permissive rather than mandatory; therefore, first factor weighed against finding that nonprofit was the functional equivalent of a government

19

state cases look to the nature of the disputed entity's activities when determining

whether it is performing an inherently "governmental function."[8] This makes sense,

---

agency); *Town of Burlington v. Hosp. Admin. Dist. No. 1*, 2001 ME 59, ¶ 3, 769 A.2d 857 (hospital district, consisting of "the inhabitants of fourteen towns" and incorporated by enabling legislation for the purpose of providing health care to those inhabitants, performed a "government function"); *Envirotest Sys. Corp. v. Freedom of Info. Comm'n*, 59 Conn. App. 753, 758-59, 757 A.2d 1202 (2000) (because state statutes obligated state to regulate vehicle emissions, for-profit corporation providing vehicle emissions inspections for the public was performing "governmental function"; however, because corporation had no statutory obligation to check emissions, and did so only pursuant to a contract, this factor did not weigh in favor of functional equivalency); *Domestic Violence Servs. of Greater New Haven, Inc. v. Freedom of Info. Comm'n*, 47 Conn. App. 466, 472, 474-75, 704 A.2d 827 (1998) (because state statutes obligated judicial branch to maintain domestic violence services, the provision of these services had "evolved into a governmental function"; however, private nonprofit that provided such services, pursuant to a subcontract, did not perform a "government function" because it was not required by statute to perform that function and it "had no decision-making role in the state's . . . programs, nor [could] it govern or regulate such programs").

[8] *E.g., Oriana House*, 2006-Ohio-4854, at ¶¶ 2, 28 (nonprofit that contracted with county to run its "community-based correctional facility and program" performed a "uniquely governmental function," the administration of jails and prisons, which "historically has been an exclusive state function" (internal quotation marks omitted) (quoting *Mossman v. Donahey*, 46 Ohio St. 2d 1, 19-20, 346 N.E.2d 305 (1976) (Brown, J., concurring)); *Cherokee Children & Family Servs., Inc.*, 87 S.W.3d at 70-71, 79 (private nonprofit, which provided child care services and placements exclusively through contracts with state department of human services, performed services that were "undeniably public in nature"); *Conn. Humane Soc'y*, 218 Conn. at 761 (nonprofit Humane Society performed "governmental function" to the extent that it engages in law enforcement activities, e.g., imposing fines or terms of imprisonment for interference with animal cruelty prevention, and arguably to the extent that it conducts police power activities, e.g., euthanizing animals); *State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St. 3d 338, 2006-Ohio-6713, 859 N.E.2d 936, at ¶ 26-31 (private nonprofit corporation, which provided mental health services pursuant to contract with the State, was performing a "'government function'" even though (1) providing mental health services was not traditionally reserved exclusively to the State, (2) there was no transfer of duties from

given that the purpose of the *Telford* test is to identify private entities that have effectively assumed the role of government—not to erode the privacy of any entity that contracts with government to further the public interest.

RCW 35.64.010, the statute authorizing cities to contract with nonprofits for the "overall management and operation of a zoo," is largely permissive. It does not obligate any city to enter into such a contract, nor does it obligate any city to operate a zoo. Thus, it is unlike the statutes at issue in *Telford, Clarke,* and out-of-state cases finding that an entity performed a government function for purposes of the functional equivalency test. RCW 35.64.010 does not transform zoo management into an inherently governmental function.

We hold that WPZS does not perform a government function for purposes of the first *Telford* factor.

### B.  *The second* Telford *factor—government funding—is inconclusive*

The parties agree that only about 30 percent of the Zoo's direct funding is ever attributable to public sources. No party provided the trial court with a valuation of

---

government agency to private entity, and (3) there was no enabling legislation obligating it to provide mental health services; this is because providing mental health care for uninsured—covering gaps in the commercial health care market—is traditionally a public sector function).

21

the city property occupied by the Zoo, but the trial court nevertheless found that the "magnitude of [real] property here . . . would be worth a considerable amount of money" and ruled that this factor weighed in favor of PRA coverage. Tr. of Proceedings (July 25, 2014) at 34. The Court of Appeals reached the opposite conclusion by focusing on a different statistic: the fact that WPZS receives a majority of its funding from private sources. *Fortgang*, 192 Wn. App. at 433.

Fortgang contends that the trial court was correct. She argues that a bright-line "'majority of total funding' rule" is inappropriate and that we should instead consider (1) the type of government funding provided (here, a taxpayer levy as opposed to something like a government grant),[9] (2) the total amount of government funding, as opposed to the percentage of an entity's total funding that is attributable

---

[9] In this first argument, she is supported by Amicus Washington Coalition of Open Government (Coalition). The Coalition agrees that funding through a voter-approved levy is a significant factor in a proper *Telford* analysis. It points to "Proposition No. 1," approved in King County's August 2013 special election, which authorized an additional property tax to fund "maintenance and operations of the King County parks system; trails and open space for recreation, habitat and water quality; city parks; and zoo programs, all subject to citizen oversight." Br. of Amicus Curiae of the Wash. Coal. of Open Gov't in Support of Pet. for Review at 3 (quoting *Proposition No. 1 Parks Levy*, KING COUNTY ELECTIONS, MEASURE INFO (Aug. 2013), http://aqua.kingcounty.gov/elections2/contests/measureinfo.aspx?cid=46026&eid=1256 [https://perma.cc/6F6J-67MM]). The Coalition argues that voters would not have approved this new tax had they not believed that all of the entities receiving the funds would be "'subject to [a level of] citizen oversight.'" *Id.* at 4. It contends that under *Telford*, 95 Wn. App. at 164, the Zoo's discretionary use of public funds weighs in favor of applying the PRA. *Id.* at 7.

22

to government sources, and (3) the provision of nonmonetary government benefits such as, in this case, city property. Suppl. Br. of Pet'r Alyne Fortgang at 6-8. Amici Service Providers (*see supra* note 6) argue that courts should not be concerned with the *amount* of public funding, but with the "nature of the government's financial involvement with the entity." Br. of Amici Service Providers at 13. They reason that this distinction is necessary to avoid sweeping up "'any private organization that received grant money.'" *Id.* at 12 (quoting *Dow v. Caribou Chamber of Commerce & Indus.*, 2005 ME 113, 884 A.2d 667).

The case law generally supports the Court of Appeals' and WPZS's approach. Out-of-state cases focus primarily on the *percentage* of funding attributable to public sources, rather than on the total amount of government funding allocated to a defendant entity.[10] To the extent courts look beyond percentage and consider the

---

[10] *E.g.*, *Oriana House*, 2006-Ohio-4854, at ¶ 32 (under functional equivalency test, government funding factor weighed in favor of covered agency status because (1) entity received 100 percent of county correctional agency's profits *and* (2) 88 percent of entity's funding came from public sources); *Nova Behavioral Health*, 2006-Ohio-6713, at ¶ 32 (funding factor weighed in favor of functional equivalency when private nonprofit government contractor received 87 to 92 percent of its total revenues from the government; fundamentally, nonprofit was dependent on government contract for its existence); *Cherokee Children & Family Servs., Inc.*, 87 S.W.3d at 79-80 (funding factor weighed in favor of functional equivalency because over 99 percent of nonprofit contractor's revenue came from government sources); *Frederick*, 289 Neb. at 878 (fact that entity received 63 percent of its funding from public sources was insufficient; no consideration of the nature of government's financial involvement).

23

nature of a public funding scheme, they hold (consistent with amici Service Providers' policy argument) that a fee-for-services model weighs *against* functional equivalency even where an entity receives all or most of its funding from public sources.[11] It would logically follow that a funding scheme weighs in favor of functional equivalency when it is a fixed allocation, i.e., designated levy funds, instead of fees for service. One Court of Appeals case so held.[12] We agree that this general rule—that the type of funding matters and, specifically, that an ordinary fee-for-services model typically weighs against functional equivalency—accurately reflects the PRA's goals of transparency in government affairs. This weighs in favor of WPZS's functional equivalency to a government agency on this factor.

But Washington cases also suggest that the *percentage* of funds attributable to public sources is the foremost consideration when applying the second *Telford* factor. *Cedar Grove*, 188 Wn. App. at 720 (government funding factor supported PRA coverage where city paid private consulting firm "for at least a majority of the

---

[11] *Domestic Violence Servs.*, 47 Conn. App. at 475-76 (even though entity received "substantial funds" from local, state, and federal government, the funds were fees for services, in the form of grants, and therefore did not weigh in favor of functional equivalency); *Envirotest*, 59 Conn. App. at 758-59 (amount of government funding irrelevant where payment is fee-for-services pursuant to contract; in that case, the funding factor weighs against a finding of functional equivalency).

[12] *Telford*, 95 Wn. App. at 164 (block grant funding, as opposed to fees-for-identified-services model, weighed in favor of PRA coverage).

24

work at issue"); *Clarke*, 144 Wn. App. at 194-95 (government funding factor weighed in favor of functional equivalency where nearly all of entity's operating budget comes from public sources); *Telford*, 95 Wn. App. at 164 (government funding factor weighed in favor of PRA coverage where "[m]ost" of entities' funds come from "current county expense funds"). And no Washington case concludes that an entity's funding supports PRA coverage in the absence of *majority* public funding. With respect to WPZS's direct monetary funding, this weighs against a finding of functional equivalency on this factor.[13]

The nature of the government funding here weighs in favor of functional equivalence; the percentage of the government funding here weighs against it. Keeping in mind that the purpose of each of these factors is to help us decide whether treating a private entity as a government agency furthers the PRA's mandate of transparency in government affairs, we find the funding evidence here inconclusive.

> C. *The third* Telford *factor, "government control," weighs against PRA coverage*

---

[13] Our case law does support Fortgang's argument that we should consider in-kind support, as well as direct monetary funding. *Clarke*, 144 Wn. App. at 194-95 (noting that entity received free rent). But neither of the courts below nor our court was ever told the value of the in-kind support WPZS received. Thus, we cannot calculate that value into our analysis.

The Court of Appeals held that the third *Telford* factor weighed against PRA coverage because "[t]he City lacks authority over day to day zoo operations" involving pricing, personnel, vendor contracting, animal exhibits, and other facilities. *Fortgang*, 192 Wn. App. at 436. Fortgang contends this was error. She argues that courts should instead focus on how an entity is regulated, making at least four inquiries: (1) whether the entity's records are subject to government audit, (2) whether any government officials are involved in the entity's operations or management, (3) whether there are any government restrictions on how the entity's facilities are run, and (4) whether the government has imposed any reporting requirements on the entity.

Amici Service Providers argue that the "government control" factor should be used to distinguish between mere regulation—which does not weigh in favor of PRA accountability—and actual day-to-day management by a government agency—which does. They argue that the Connecticut test adopted in *Telford* has been interpreted that way. Br. of Amici Service Providers at 15.

Out-of-state case law largely supports Service Providers' argument. It distinguishes between day-to-day control (supporting functional equivalency) and

mere regulation (supporting private entity status).[14] We agree. There is no good reason to value government transparency more in a heavily regulated area than in a less regulated area. Nor is there any good reason for an entity to be subject to PRA transparency requirements *because* other laws (or contracts) *already* mandate a certain amount of transparency. Thus, we decline to adopt the four-part test that Fortgang proposes for determining whether an entity is subject to government control under *Telford*. The "day-to-day operations" analysis followed in other jurisdictions better furthers the purposes of the PRA: preventing governments from operating (as governments) in secrecy.

---

[14] *E.g.*, *Frederick*, 289 Neb. at 876-78 (where city has "representation on [nonprofit's] board of directors, but not control" of its decisions or operations, this factor weighs against a finding of functional equivalency); *Nova Behavioral Health*, 2006-Ohio-6713, at ¶ 32-36 (government control factor weighed against functional equivalency finding because although state regulated nonprofit government contractor, it did not have any control over nonprofit's "day-to-day operations"); *Oriana House*, 2006-Ohio-4854, at ¶ 27 ("government involvement or regulation" factor did not weigh in favor of functional equivalency finding because government did not control "day-to-day operations" of nonprofit contractor); *Envirotest*, 59 Conn. App. at 760-62 ("[b]ecause the government does not control the day-to-day activity of the plaintiff's business, the third prong of the functional equivalent test is not met"); *Domestic Violence Servs.*, 47 Conn. App. at 477 (regulation, as opposed to "day-to-day control," does not weigh in favor of functional equivalency finding). *But see Cherokee Children & Family Servs., Inc.*, 87 S.W.3d at 79-80 ("although [the state] did not exercise complete control or supervision over [nonprofit government contractor], a significant level of governmental control and oversight is evidenced by the provisions in the . . . contracts requiring advance State approval of 'allowable costs' under the contracts and the provisions in all three contracts authorizing State audits of [the nonprofit's] activities").

Because no government is involved in WPZS's day-to-day operations at the Zoo, the third *Telford* factor weighs against PRA coverage in this case.

### D. The fourth Telford factor—the entity's "origin"—weighs against PRA coverage here

The final *Telford* factor is entity creation. Fortgang argues that courts should not limit their inquiry to whether a government actually incorporated the entity at issue. She contends that courts should instead ask whether the government was involved in the entity's creation. She also argues for a more limited concept of the "entity" at issue in this case: she asserts that we should consider whether WPZS "may be performing a government function *in some respects*" and the origins of its ability to do so. Suppl. Br. of Pet'r Alyne Fortgang at 19-20 (emphasis added). But the relevant case law does not support her position.

At least two out-of-state cases consider whether a disputed entity was created pursuant to "special legislation," indicating that this characteristic weighs in favor of functional equivalency. *State ex rel. Repository v. Nova Behavioral Health, Inc.*, 112 Ohio St. 3d 338, 2006-Ohio-6713, 859 N.E.2d 936, at ¶ 37 (final factor weighed against functional equivalency finding where entity was "not established by a governmental entity or pursuant to any special legislation"); *Oriana House, Inc. v.*

28

*Montgomery*, 110 Ohio St. 3d 456, 2006-Ohio-4854, 854 N.E.2d 193, at ¶ 34 (final factor weighed against finding of functional equivalency where nonprofit was not created by a governmental entity or pursuant to any special legislation and where there was no evidence in the record that nonprofit was "created [or used by the government] to avoid the requirements of the Public Records Act"; it was irrelevant that the private incorporators "may well have envisioned and even depended on procuring a government contract"). But WPZS was incorporated solely by private individuals, so we cannot attribute its "origin" to special legislation or other government action.

To be sure, WPZS ultimately assumed control of the Zoo pursuant to RCW 35.64.010. But our cases distinguish that sort of statutory authorization from an entity's "origin" under *Telford*. *See Clarke*, 144 Wn. App. at 193-94 (local government granted defendant the authority to exercise police powers pursuant to state statute, but "origin" factor still weighed against PRA coverage because defendant was originally formed as a private corporation). Again, this makes sense in light of the PRA's purposes. The *Telford* test is designed to prevent the government from operating in secrecy via a private surrogate. It is not designed to sweep within PRA coverage every private organization that contracts with

government. This remains true even if the contracts in question are governed or authorized by statute.

We hold that the fourth *Telford* factor weighs against PRA coverage here.

*E. On balance, the* Telford *factors weigh against PRA coverage*

Although the second *Telford* factor is inconclusive here, all the other factors weigh against PRA coverage: WPZS does not perform an inherently governmental function when it operates the Zoo; the City does not exercise sufficient control over the Zoo's daily operations to implicate PRA concerns; and WPZS was created solely by private individuals—its origin is not traceable to any government action.

Most importantly, the relationship between the City and WPZS does not implicate the problem that the *Telford* test was designed to protect against: governments operating in secret through private entity surrogates. *See Clarke*, 144 Wn. App. at 194 ("were we to conclude that TCAC is not a functional equivalent of a public agency, we would be setting a precedent that would allow governmental agencies to contravene the intent of the . . . [PRA] by contracting with private entities to perform core government functions"). The City does not maintain such control over the Zoo's decision-making or day-to-day operations that it can reasonably be said to be acting through WPZS. And because operating a zoo is not a nondelegable,

"core" government function, this case does not involve the privatization of fundamentally public services.

Instead, this case involves a decision by the City to (1) cede much of its control over and responsibility for the Zoo's operations, (2) continue to provide some financial and material support for the Zoo, and (3) maintain the amount of public oversight necessary to ensure that WPZS uses that support responsibly. This arrangement does not implicate the concerns underlying the PRA.

## CONCLUSION

We affirm the Court of Appeals' decision to apply the *Telford* factors in this case. The *Telford* test is the proper analytical framework for evaluating a private or quasi-private entity's disclosure requirements under the PRA. We also affirm the Court of Appeals' decision that WPZS is not an "agency" subject to PRA requirements.

31

WE CONCUR: