IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DANIELLE GRAY,<br><br>          Appellant,<br><br>          v.<br><br>CITY OF SEATTLE; and the<br>SEATTLE OFFICE OF HOUSING,<br><br>          Respondent. | No. 88542-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Danielle Gray is a tenant at Toshiro Kaplan Artist Lofts (TK). On January 17, 2024, Danielle Gray submitted records request to the City of Seattle. Gray requested documents "related to rent increase policies and historical data" regarding TK lofts. On February 11, 2024, Gray submitted a second request for additional documents related to TK. The City produced responsive documents in two installments and subsequently closed Gray's request. Gray initiated a complaint under the Public Records Act (PRA), ch. 42.56 RCW, against the City and the Seattle Office of Housing (SOH), claiming that the City violated the PRA, among other things. The City moved for summary judgment, which was granted by the court. Gray appeals. We affirm.

FACTS

The Toshiro Kaplan Artist Lofts (TK) are located at 115 Prefontaine Place South in Seattle, Washington. On January 17, 2024, Danielle Gray, a tenant at TK, submitted a public records request to the City of Seattle public records

request center.  Gray requested documents "related to rent increase policies and historical data" about TK, including:

> –Seattle Housing Policies and Procedures on Rent Increases: Documentation outlining policies and procedures for increasing rents that exceed established controls.  This includes safeguards against personal biases, political influences, and other potential abuses.
>
> –Rent Increase Record for 2024: Information on the approved rent increase set for the Tashiro Kaplan Artist Lofts through 2024.
>
> –Operating Budgets (2016-2024): Submitted operating budgets for the Tashiro Kaplan Artist Lofts for each year from 2016 to 2024.

On January 24, 2024, Nathan Haugen, the public disclosure officer for SOH, responded to Gray's request, notifying her that the first installment date was estimated on or about February 26, 2024.

On February 11, 2024, Gray submitted an additional public disclosure request.  In the request, Gray detailed:

> I would like to receive a copy(s) of the submitted management plan for the Tashiro Kaplan Artist Lofts (ArtSpace Kaplan LLC) that would have been submitted in 2003 or 2004 at founding. If a yearly or updated management plan is also required at any time, I would like to request those copies as well.
>
> . . .
>
> [a]  I am interested in the Office of Housing Performance Letters for the Tashiro Kaplan Artist Lofts located at 115 Prefontaine Place South for years between 2018-most recent.
>
> [b]  I am also interested any building inspections the SOH would have reported/recorded for annual compliance between the years of 2018-most recent.

*SOH's First Installment*

On February 15, 2024, SOH responded to Gray's request, notifying her that the first installment date in response to requests [a] and [b] was estimated on or about April 15, 2024.  On February 28, 2024, SOH notified Gray that

2

documents for requests [a] and [b] would be consolidated with her initial request. SOH also informed Gray that the updated first installment date was March 12, 2024, because additional time was needed to compile records. In response, Gray stated her concerns about the potential delay and asked SOH to prioritize her initial request.

On March 11, 2024, SOH produced the first installment of the records and notified Gray that the next installment was estimated on April 12, 2024. Gray replied, asking why SOH did not include the operating budgets for 2022 and 2023. SOH replied on March 20, informing Gray that the highlighted documents were not found in the public disclosure search and did not appear to be in SOH's custody. Gray followed up, stating, "budgets would have been required per city regulations. This means that either the documents were withheld OR they were not submitted by the property as required. Could you please point me in the direction to get understanding about what happened?" SOH did not reply.

*SOH's Second Installment*

On April 19, 2024, Gray inquired about the status of her request. On April 25, SOH sent Gray the second installment of records. Additionally, SOH explained that the delays were due to the time required to retrieve and review the documents, and a "[b]acklog of additional reports due to staffing shortages and pandemic disruptions."

In July 2024, Gray received a satisfaction survey for her PRA request. Gray asked SOH if her PRA request was closed. SOH confirmed, stating that it was unable to locate the original management plan and had no more responsive

records related to Gray's request. Gray expressed concern that documents were missing and requested that SOH reconsider its search efforts.

*Initial Complaint and Summary Judgment*

On December 3, 2024, Gray initiated a complaint under the PRA against the City and SOH. Gray's suit claimed that the City violated public records statutes, among other things. The City moved for summary judgment, which was granted by the court. In part, the court found that the City did not violate the PRA and that it responded to Gray's requests within five business days. The court found that the City gave Gray "a specific date by which the records were estimated to be produced in compliance with the PRA." The court also found,

> [D]espite there being no obligation under the PRA to do so, the City provided Ms. Gray with an explanation of why some records were not produced. It is undisputed that the City is experiencing a backlog of work related to affordable housing participants because the City redirected its resources in 2020 to the COVID-19 pandemic. To the extent Ms. Gray is dissatisfied with the City's policy choice, she has political remedies available to her which are outside the scope of the PRA. Consequently, the City has satisfied RCW 42.56.100 and *Bonamy v. City of Seattle*.

Gray appeals.

## ANALYSIS

### Legal Principles

Agency actions under the PRA are reviewed de novo. *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 715, 261 P.3d 119 (2011).

A public record "includes any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency

4

regardless of physical form or characteristics." RCW 42.56.010(3). The PRA "disclosure provisions are construed broadly, and its exceptions are construed narrowly." *Gronquist v. Dep't of Corr.*, 32 Wn. App. 2d 617, 629, 557 P.3d 706 (2024), *review denied*, 4 Wn.3d 1011 (2025). The PRA defines two types of violations: " '(1) when an agency wrongfully denies an opportunity to inspect or copy a public record or (2) when an agency has not made a reasonable estimate of the time required to respond to the request.' " *Gronquist*, 32 Wn. App. 2d at 629 (quoting *Andrews v. Wash. State Patrol*, 183 Wn. App. 644, 651, 334 P.3d 94 (2014)).

### Adequate Search

An agency's public records search " 'need not be perfect, only adequate.' " *Block v. City of Gold Bar*, 189 Wn. App. 262, 273, 355 P.3d 266 (2015) (Internal quotation marks omitted) (quoting *Neigh. All.*, 172 Wn.2d at 720). The PRA does not define *adequate search*. *Neigh. All.*, 172 Wn.2d at 719. Our Supreme Court has held that an adequate search under the PRA adequacy analysis is fact dependent and "is judged by a standard of reasonableness, that is, the search must be reasonably calculated to uncover all relevant documents." *Neigh. All.*, 172 Wn.2d at 720. Agencies must "make more than a perfunctory search" and "follow obvious leads as they are uncovered." *Neigh. All.*, 172 Wn.2d at 720. An agency is not required to search *every* place a record could conceivably be stored, only the places the requested records are *reasonably likely* to be found. *Neigh. All.*, 172 Wn.2d at 724. The fact that additional responsive records are

found later does not itself establish that a search was inadequate. *Neigh. All.*, 172 Wn.2d at 724.

The agency bears the burden of establishing that its search was adequate. *Neigh. All.*, 172 Wn.2d at 721. The agency may rely on "reasonably detailed, nonconclusory affidavits submitted in good faith." *Neigh. All.*, 172 Wn.2d at 721. "Affidavits should include the search terms and the type of search performed, as well as information to establish that all places likely to contain responsive materials were searched." *Gronquist*, 32 Wn. App. 2d at 630.

a. Search Terms Used

Gray asserts that the City failed to use terms used in the request, names of known records within the requested categories, and SOH's internal terminology related to her search. Namely, Gray emphasizes that the City did not use the terms: *rent increase*, *2022*, *2023*, *2024*, *capital needs assessment*, *CNA*, *Table 4*, and *right sizing*. The City maintains that it used reasonable search terms and that Gray's public records request did not include *capital needs assessment* and *CNA*.

Haugen's declaration indicated that after Gray submitted her PRA request, he consulted with subject matter experts[1] to identify and locate documents relating to Gray's search. Based on the guidance received, Haugen then searched for electronic files on SharePoint and network drives. Haugen declared that he searched for *housing funding policy*, *management plan*, *annual report*,

---

[1] Haugen's declaration stated that he consulted with Lacey Barker, a senior asset manager in SOH's asset management team.

and the original loan documents for the TK apartments.  These searches produced several documents that SOH provided to Gray.  Haugen used search terms relevant to Gray's request and consulted subject matter experts to determine where to look for the requested files.  Haugen's search was reasonably calculated to uncover all relevant documents.

b.  Narrowed Search

Gray contends that the City unreasonably narrowed her search when Haugen found a management plan file that he did not send to Gray.  The City asserts that it did not unreasonably narrow Gray's request because it relied on the plain language of the request.

The PRA is a mandate for " 'broad disclosure of public records.' "  *O'Dea v. City of Tacoma*, 19 Wn. App. 2d 67, 78, 493 P.3d 1245 (2021) (internal quotation marks omitted) (quoting *Serv. Emps. Int'l Union Local 925 v. Univ. of Wash.*, 193 Wn.2d 860, 866-67, 447 P.3d 534 (2019)).  "An agency should not unreasonably assume a narrow interpretation of a request."  *Cantu v. Yakima Sch. Dist. No. 7*, 23 Wn. App. 2d 57, 99, 514 P.3d 661 (2022).  However, the requestor must give "a reasonable description [that enables] the government employee to locate the requested record."  *Beal v. City of Seattle*, 150 Wn. App. 865, 875, 209 P.3d 872 (2009).  The PRA does not "require public agencies to be mind readers."  *Bonamy v. City of Seattle*, 92 Wn. App. 403, 409, 960 P.2d 447 (1998).

In Gray's second PRA request, she sought copies of TK's management plan, stating that it "would have been submitted in 2003 or 2004 at founding" and

7

any updates to the plan.  The management plan found by Haugen was a policy document from the building's owner, not the property management company. The building owner's management plan was a scope of work on the owner's property management for the building.  Because Gray's request did not identify the building owner's management plan, it was reasonable for the City to determine that the document was unresponsive.

c.  Records Not Sent to Gray

Gray also asserts that the City's search was not adequate because there were records that the City produced in litigation that it did not send to Gray in her PRA request.  The City maintains that it fulfilled her request with the documents that the City possessed at the time of her request.

"The PRA does not require agencies to create or produce records that do not exist." *O'Dea*, 19 Wn. App. 2d at 79.  Public disclosure is not required " 'until and unless there has been a specific request for records.' " *Germeau v. Mason County*, 166 Wn. App. 789, 804, 271 P.3d 932 (2012) (internal quotation marks omitted) (quoting *Wood v. Lowe*, 102 Wn. App. 872, 876-77, 10 P.3d 494 (2000)).

As discussed *supra*, based on Gray's requests, Haugen declared that his search exhausted all locations where relevant records could be possibly located. Haugen also informed Gray that some documents, including the operating budgets for 2002 to 2024, were not found during his search.  Haugen also explained to Gray that some documents did not exist at the time of her request because of backlogged reporting and reporting cycles.  Barker's declaration

8

supports Haugen's explanation, stating that SOH paused onsite inspections, SOH staff were reprioritized to address access to affordable housing, and annual reporting was backlogged. The City established that the documents requested by Gray did not exist. The City is not required to produce documents that do not exist and therefore, there was no ability or requirement to produce them. The trial court did not err.

### d. TK Compliance with the PRA

Gray contends that the City did not search where records were most likely to be found. Namely, Gray claims that the City's search was inadequate because it did not ask TK to produce records. Gray asserts that TK is subjected to the PRA because it is a public funded entity. The City maintains that TK is not subjected to the PRA because its business operations are independent of city functions.

A private entity may be subjected to the PRA if the entity is the " 'functional equivalent of a state or local agency.' " *Fortgang v. Woodland Park Zoo*, 187 Wn.2d 509, 517, 387 P.3d 690 (2017) (quoting *Clarke v. Tri-Cities Animal Care & Control Shelter*, 144 Wn. App. 185, 192, 181 P.3d 881 (2008)). Our Supreme Court has held that the *Telford*[2] test, which interprets the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, is legally analogous in determining whether a private entity is subjected to the PRA. *Fortgang*, 187 Wn.2d at 513. The *Telford* factors are considered on balance, they include: "(1)

---

[2] *Telford v. Thurston County Bd. of Comm'rs*, 95 Wn. App. 149, 163, 974 P.2d 6886 (1999).

whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government involvement in the entity's activities, and (4) whether the entity was created by the government." *Fortgang*, 187 Wn.2d at 518. When programs "are conducted by an organization as a contractor rather than as governmental entity, however, the organization is not performing a governmental function." *Horvath v. DBIA Servs.*, __ Wn.2d __, 580 P.3d 969, 976 (2025). In *Fortgang*, our Supreme Court found that Woodland Park Zoo was not performing a "core" government function and was not subject to the PRA because: (1) "the [z]oo does not perform any function unique or essential to government[,]" (2) " '[n]o case has ever applied the PRA to an entity where public funding comprises less than a significant percentage . . . of the entity's total revenue[,]' " (3) "no government controls the day-to-day operations at the zoo[,]" and (4) the zoo was "formed entirely by private citizens as a private organization." 187 Wn.2d at 523-24; 533 (second alteration in original).

First, TK does not perform a government function or one unique to the government. In *Cedar Grove Composting, Inc. v. City of Marysville*, we found that the work of a third-party contractor was performing a governmental function when the contractor was "act[ing] as the functional equivalent of a city employee." 188 Wn. App. 695, 719, 354 P.3d 249 (2015). TK provides and manages artist housing; property management is not a functional equivalent of a city employee.

10

Next, addressing the extent that the City funds the entity's activities, the City asserts that TK is a grant recipient. The City executed a loan agreement with TK for $2,420,000 to acquire and develop 50 units of low-income housing. A loan "a thing lent for the borrower's temporary use." BLACK'S LAW DICTIONARY 1120 (12th ed. 2024). The record does not support that the City funds TK's activities.

Barker's declaration outlines the extent of the City's involvement in TK's activities. The City conducts compliance monitoring and supports housing projects on complex property management compliance issues. Barker explained that compliance monitoring includes a tri-annual inspection by SOH staff and annual reports submitted to SOH. Annual reports and compliance monitoring do not rise to the level of controlling the day-to-day operations of TK.

Lastly, there is no evidence that the City created TK. TK is owned by Artspace Kaplan. The loan agreement states that Artspace is a limited liability company located in Minneapolis, Minnesota. The evidence supports that Artspace is a private entity. The *Telford* factors do not support Gray's assertion that TK is subjected to the PRA. The City had no duty under the PRA to seek records from TK.

<u>Providing Fullest Assistance</u>

Gray asserts that the City's explanation that records did not exist due to the COVID backlog and staff shortage was not an adequate response because the disputed records existed at the time. Further, Gray contends the City's

COVID backlog explanation was made in bad faith.[3]  The City maintains that it is not required to prove that a record does not exist.

When fulfilling a PRA request, the agency "shall provide for the fullest assistance to inquirers and the most timely possible action on requests for information."  RCW 42.56.100.  We must consider the totality of the circumstances to determine whether the agency "was providing 'the fullest assistance to inquirers and the most timely possible action on requests for information.' "  *C.S.A. v. Bellevue Sch. Dist. No. 405*, 32 Wn. App. 2d 544, 564, 557 P.3d 268 (2024), *review denied*, 4 Wn.3d 1019 (2025) (internal quotation marks omitted) (quoting *Cantu*, 23 Wn. App. 2d at 94).

Gray does not provide evidence that the City's explanation regarding lack of records was meant to conceal the existence of records.  Haugen's declaration stated that several of Gray's requested records did not exist.  Although agencies are not required to explain records, Haugen informed Gray that based on his search and understanding of potentially responsive records, all records related to TK and rent control were produced in the first installment.  When Haugen sent Gray the second installment of documents, he explained to Gray that building inspections were only conducted every three years, and annual reports were backlogged because of staffing shortages and disruption related to the COVID

---

[3]  "Whether an agency acted in bad faith under the PRA presents a mixed question of law and fact, in that it requires the application of legal precepts (the definition of 'bad faith') to factual circumstances (the details of the PRA violation)."  *Francis v. Dep't of Corr.*, 178 Wn. App. 42, 51-52, 313 P.3d 457 (2013).

pandemic.  Haugen continued to provide Gray with updates on his search. Haugen informed Gray that he did not find TK's original management plan when he searched physical files.  Haugen declared, "I determined that the best course of action was to provide all the collected materials, even if not directly responsive, to provide Ms. Gray with as much assistance as possible."  We find that Haugen provided the fullest assistance to Gray.

<u>Remedies Under the PRA</u>

Gray asserts that the court committed a constitutional error when it stated, "to the extent Ms. Gray is dissatisfied with the City's policy choice, she has political remedies available to her which are outside the scope of the PRA."

Reviewing the court's fact finding in its entirety, the court's statement referred to the City's timeline and the fact that the City was experiencing a backlog of work related to affordable housing participants because it had redirected its resources in 2020 to the COVID-19 pandemic.

The court's fact finding states, "consequently, the City has satisfied RCW 42.56.100 and *Bonamy v. City of Seattle.*"  The cited statute refers to the protection of public records and agencies' obligations under the PRA.  It does not address a municipality's policy choices or political remedies outside the PRA. Next, *Bonamy* held, in part, that the PRA "does not require agencies to research or explain public records, but only to make those records accessible to the public."  92 Wn. App. at 451.  Similarly, *Bonamy* does not address political remedies outside the scope of the PRA.  The court did not deny Gray's request for a statutory remedy based on the characterization of her speech, but rather

No. 88542-1-I/14

denied her request due to the limitations of the scope of the PRA.  We find no error.

We affirm.

_____

WE CONCUR:

_____, ACJ     _____
Mann, J.