# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| DAVID O'DEA, an individual, | No. 53613-7-II |
| Respondent/Cross Appellant, | |
| v. | |
| CITY OF TACOMA, a public agency; and the TACOMA POLICE DEPARTMENT, a public agency, | PART PUBLISHED OPINION |
| Appellants/Cross Respondents. | |

GLASGOW, A.C.J.—The Tacoma Police Department placed Lieutenant David O'Dea on administrative leave following a shooting incident in August 2016, investigated his conduct, and ultimately fired him in June 2017. While on administrative leave, O'Dea requested documents and information from the Department relating to the investigation and his participation in a promotional test. In March 2017, O'Dea's lawyer mailed two letters requesting documents under the Public Records Act (PRA), chapter 42.56 RCW. It is undisputed on appeal that the City of Tacoma's public records officer never received these letters and did not respond.[1]

O'Dea then sued the City in November 2017, alleging multiple PRA violations. O'Dea attached the PRA request letters as exhibits to the complaint. The City answered the complaint but did not start responding to the PRA request letters until nine months later.

---

[1] The Tacoma Police Department is a department of the City of Tacoma.

Both parties filed cross motions for partial summary judgment. The trial court granted O'Dea's motion, holding that the City had an obligation under the PRA to respond to the two PRA request letters when it received them as attachments to the complaint. The trial court also granted the City's motion for partial summary judgment, dismissing O'Dea's other claims. The trial court then awarded approximately $2.6 million in penalties to O'Dea for the City's delay in responding to the two letter requests after receiving them with the complaint in November 2017.

The City appeals the order granting O'Dea's motion for partial summary judgment and imposing penalties. O'Dea cross appeals the dismissal of his other claims, the denial of a motion for additional searches, and the trial court's refusal to find bad faith. The City seeks to reverse the attorney fees award in favor of O'Dea below, and O'Dea requests attorney fees on appeal.

We affirm the trial court's summary judgment decision. The trial court properly concluded that the City violated the PRA when it failed to respond to the two PRA request letters when it received them as attachments to the complaint. The trial court also properly dismissed O'Dea's remaining claims. However, we reverse the $2.6 million penalty award as an abuse of discretion and remand for recalculation of penalties and attorney fees consistent with this opinion. We award appellate attorney fees to O'Dea to the extent fees for his prevailing argument can be segregated.

FACTS

In August 2016, O'Dea fired multiple shots at a car whose driver was trying to flee a group of officers. The Department placed O'Dea on administrative leave and investigated whether he had violated Department policies. O'Dea made several requests for information and records while he was on administrative leave. We address issues related to those requests in the unpublished portion of this opinion.

A.      March 2017 PRA Request Letters

In March 2017, O'Dea's counsel, Brett Purtzer, wrote and mailed to the Department two letters explicitly requesting documents under the PRA on O'Dea's behalf. The subject lines of both letters read, "PUBLIC RECORDS REQUEST." Clerk's Papers (CP) at 23, 25 (underscore omitted).

The first letter, dated March 24, 2017, requested several categories of records. O'Dea sought documentation showing how the Department tracked internal affairs investigations from 2006 to 2017. Purtzer requested information about the deadly force review board and "[c]opies of any and all Claims for Damages filed against the . . . Department for the period January 1, 2006 [to] March 17, 2017," relating to use of force, personal injury, civil rights violations, racial discrimination, harassment, and bias. CP at 24 (underscore omitted). O'Dea sought policies and procedures for notifying Department staff about incidents involving use of force and deployment of chaplains and other support services for officers involved in use of force incidents.

The second PRA request letter, dated March 28, 2017, requested three additional categories of records. O'Dea requested training directives and special orders that addressed the use of force, as well as "[d]ata" about these trainings, including dates, times, locations, "[p]ersonnel attending," and "[t]opics covered in the training." CP at 25. O'Dea asked for "[p]ersonnel [r]osters or any other documents or reports" revealing "the assignments of personnel within the various bureaus of the Department" from 1995 to 2017. *Id.* Finally, the letter sought "memorandums, notifications, emails, and/or text messages concerning [the assistant chief's]" interviews for positions outside the Department. CP at 26.

Purtzer's paralegal testified that she deposited the letters in the mail on March 24 and 28, 2017. For reasons that are unclear, the City's public records officer did not receive them, a fact that is not contested on appeal.

B.      November 2017 Complaint

In June 2017, The Department terminated O'Dea's employment and a review board upheld that decision.

In November 2017, O'Dea sued the City, alleging violations of the PRA. O'Dea alleged that he made multiple requests for records under the PRA via the two PRA request letters and in other communications and that the Department violated the PRA by withholding responsive records. O'Dea requested penalties and "[a]n order that all records requested . . . be provided promptly for inspection and copying." CP at 21. O'Dea attached the PRA letters as exhibits to both his initial and amended complaints. In its answer, the City denied receiving the PRA request letters. The City did not transmit the PRA request letters to its PRA officer at that time nor did it begin to respond to the PRA requests.

C.      Cross Motions for Summary Judgment and Initial Response to PRA Requests

In May 2018, the City sent interrogatories and requests for production to O'Dea asking him to identify the communications he claimed were PRA requests. O'Dea again provided the two PRA request letters in response to the request for production.

In June 2018, O'Dea moved for partial summary judgment, arguing that the two PRA request letters attached to his complaint were public records requests and that the City failed to provide a timely response.

In July 2018, City attorney Jennifer Taylor e-mailed Purtzer, asking if he wanted to treat the two letters attached to the complaint as PRA requests. Purtzer did not respond.

In August 2018, the City deposed Purtzer's paralegal, Lee Ann Mathews. While on the record, Taylor reiterated that the City did not receive the letters purportedly mailed in March and again asked Purtzer whether she should give the letters to the public records staff to begin responding. Purtzer told Taylor that the City should have done so when it received the complaint in November 2017, but he confirmed that Taylor should send the letters to the public records staff. Taylor immediately sent the letters to Lisa Anderson, a public records officer for the City.

On August 31, 2018, within five days of receiving the two PRA request letters, Anderson sent Purtzer a notice acknowledging his PRA requests. Anderson told Purtzer that the City would likely finish responding to the letter originally dated March 28, 2017 by October 2, 2018. For the more extensive March 24, 2017 letter, Anderson estimated the City would provide complete responses by February 27, 2019. Due to the more complicated requests in the March 24, 2017 letter, Anderson warned Purtzer that it could take up to a year to fully respond. Anderson said the City would provide responses in monthly installments.

In September 2018, the City moved for partial summary judgment, asking the trial court to dismiss all of O'Dea's PRA claims except those arising from the two PRA request letters. The City also responded to O'Dea's motion for partial summary judgment, explaining that it never received the letters in March 2017. The City further contended that attaching the letters to the complaint did not constitute a valid PRA request.

On October 2, 2018, the City provided more than 500 documents in response to the letter originally dated March 28, 2017 and closed that request. The City continued to work on its response to the larger March 24, 2017 letter.

The trial court granted both parties' motions for partial summary judgment. The trial court found there was no dispute that the City received the two PRA letters as attachments to the complaint. The trial court held that the letter attachments constituted valid PRA requests and there was "no genuine issue of material fact that the City violated [the] PRA regarding those two letters" when it failed to respond to these requests upon receipt of the complaint. CP at 438. The trial court also granted the City's motion for partial summary judgment, holding that none of O'Dea's other communications during his administrative leave could reasonably have been construed as PRA requests.

D.     Production of Records in Installments and Initial PRA Penalty Award

On December 13, 2018, the City provided its first installment of records for the PRA request letter originally dated March 24, 2017.

Later in December 2018, O'Dea filed a motion for an order compelling production of the outstanding documents, for a show cause order requiring the City to explain why it would take one year to fully produce all records responsive to the March 24, 2017 letter, and for penalties based on the records the City had produced so far. The City provided two more installments of records in response to the March 24, 2017 letter in late January 2019 and on February 1, 2019.

On February 6, 2019, the trial court entered an initial decision on penalties. The trial court discussed the *Yousoufian*[2] factors used to inform public records penalties, finding three aggravators

[2] *Yousoufian v. Office of Ron Sims*, 168 Wn.2d 444, 467-68, 229 P.3d 735 (2010).

and one mitigator. For each of the PRA request letters, the trial court imposed $10 per day, *per record* penalties beginning on the date the City first received the requests with the complaint and ending when the City began responding. The trial court imposed a $39,500 penalty for the letter dated March 24, 2017 and a $1,731,280 penalty for the letter dated March 28, 2017.

The trial court also ordered the City to conduct additional searches for the remaining documents "within 30 days of the date of this Order" and "penalties for additional documents identified in the search will be determined later upon completion of the search." CP at 585.

The City filed a motion for reconsideration of the penalty order, arguing, "The Court's order to produce all documents within 30 days - rather than setting a show cause hearing as requested by the parties, or making a determination whether the City's estimate was reasonable - [was] also premature." CP at 604 (boldface omitted). The trial court denied the motion for reconsideration.

The City provided two more installments of records responsive to the March 24, 2017 letter later in February and closed that request on February 21, 2019, ahead of its estimated completion date and the close of the trial court's 30-day window.

E.     Additional Penalties

On April 3, 2019, O'Dea filed a motion for additional penalties based on a declaration in which he alleged numerous deficiencies in the City's responses. O'Dea also moved to compel additional searches and produce documents responsive to the PRA request letters that he claimed were missing. O'Dea argued that the City's five installments responding to the March 24, 2017 letter since its first installment in December 2018 supported an additional penalty of over $830,000.

Later in April, the City found and disclosed two more sets of responsive records. One record, responsive to the March 24, 2017 letter, was inadvertently not produced sooner because of a software glitch. The City also found 12 files responsive to the March 28, 2017 letter in an old computer drive previously thought to have been purged of relevant materials.

In May 2019, O'Dea filed a supplemental declaration and additional briefing arguing that the City had destroyed responsive records after receiving his PRA requests. O'Dea contended that this supported a finding of bad faith and mandated a higher per day penalty under *Yousoufian*. The City acknowledged that it had inadvertently purged six files from a database containing responsive records in November 2018.

In June 2019, the trial court granted O'Dea's motion for additional penalties based on responses not already included in the trial court's February 6, 2019 penalty order. According to the trial court, the fact "[t]hat additional documents were found after the Court's February 6, 2019 order supports a finding that the City's prior search in response to the March 28, 2017 request was inadequate." CP at 1114. The trial court concluded that every search for documents responsive to the March 24, 2017 request, except the documents discovered after the City resolved the computer glitch, were also subject to additional per record, per day penalties. The trial court employed a separate penalty period for each installment and each period spanned the number of days between the City's receipt of the complaint in November 2017, and the date it produced records. The trial court did not find that the destruction of records evinced bad faith.

The trial court increased the penalty award for the March 24, 2017 letter to $813,300 and added $63,360 in penalties for the 12 recently discovered files responsive to the March 28, 2017 letter. In total, the trial court awarded O'Dea $2,607,940 in PRA penalties.

The City appeals the October 2018 order granting O'Dea's motion for partial summary judgment, the February 2019 decision imposing penalties, and the June 2019 final judgment.

ANALYSIS

I. THE CITY'S APPEAL

A.    Background on the PRA

The PRA is a "'strongly worded mandate for broad disclosure of public records.'" *Serv. Emps. Int'l Union Local 925 v. Univ. of Wash.*, 193 Wn.2d 860, 866-67, 447 P.3d 534 (2019) (*SEIU*) (internal quotation marks omitted) (quoting *Yakima County v. Yakima Herald-Republic*, 170 Wn.2d 775, 791, 246 P.3d 768 (2011)). The PRA must be "liberally construed and its exemptions narrowly construed." RCW 42.56.030.

A government agency must disclose responsive records unless a specific exemption in the PRA or another statute applies. *Fisher Broad.-Seattle TV LLC v. City of Seattle*, 180 Wn.2d 515, 521-22, 326 P.3d 688 (2014); RCW 42.56.070(1). The PRA does not require agencies to create or produce records that do not exist. *Fisher*, 180 Wn.2d at 522. The PRA requires adequate searches for responsive records and an inadequate search is treated as a PRA violation. *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 721, 261 P.3d 119 (2011). A trial court reviews agency actions under the PRA de novo and "may conduct a [PRA] hearing based solely on affidavits." RCW 42.56.550(3).

We review de novo "both the agency action and the court opinions below." *Fisher*, 180 Wn.2d at 522; *see also* RCW 42.56.550(3). If "the record on appeal consists solely of declarations or other documentary evidence, we stand in the same position as the trial court." *SEIU*, 193 Wn.2d

at 866. We review penalty assessments and attorney fees awarded under the PRA for an abuse of discretion. *Hoffman v. Kittitas County*, 194 Wn.2d 217, 224, 228, 449 P.3d 277 (2019).

In reviewing a summary judgment decision, we apply the same standard as the trial court. *Neigh. All.*, 172 Wn.2d at 715. Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). We review all evidence and reasonable inferences in the light most favorable to the nonmoving party and consider only the evidence that was brought to the trial court's attention. *West v. City of Tacoma*, 12 Wn. App. 2d 45, 69-70, 456 P.3d 894 (2020); RAP 9.12. We review the trial court's conclusions of law de novo and may affirm on any basis supported by the record. *Bavand v. OneWest Bank, FSB*, 196 Wn. App. 813, 825, 385 P.3d 233 (2016); RAP 2.5(a).

B.     Two PRA Request Letters

The City argues that although the PRA request "letters are plainly PRA requests on their faces, the City never received them in a context recognizable as PRA requests." Br. of Appellants/Cross-Resp'ts at 22. According to the City, "exhibits attached to a PRA complaint do not give an agency 'fair notice' that the exhibits themselves [were] *new* PRA requests." *Id.* at 19 (boldface omitted). We disagree.

1.     Fair notice test

"'[T]he P[R]A only applies when public records have been requested. In other words, public disclosure is not necessary until and unless there has been a specific request for records.'" *Germeau v. Mason County*, 166 Wn. App. 789, 804, 271 P.3d 932 (2012) (alterations in original) (internal quotation marks omitted) (quoting *Wood v. Lowe*, 102 Wn. App. 872, 876-77, 10 P.3d 494 (2000)). "No official format is required for making a records request; however, agencies may

recommend that requestors submit requests using an agency provided form or web page." RCW 42.56.080(2). A requester need not expressly reference the PRA. *Germeau*, 166 Wn. App. at 806. Nor must a requester submit their request to a designated PRA coordinator. *Id.* at 806 n.17.

Washington courts apply a "fair notice" test to distinguish PRA requests from those arising from some other legal authority. *Id.* at 804. "[T]he person requesting documents from an agency" must "state the request with sufficient clarity to give the agency fair notice that it ha[s] received a request for a public record." *Wood*, 102 Wn. App. at 878. "Fair notice" under the PRA does not have a comprehensive definition, but Washington courts "have advanced factors that comprise 'fair notice.'" *Germeau*, 166 Wn. App. at 805. "These factors fall under two broad categories: . . . characteristics of the request itself, and . . . characteristics of the requested records." *Id.*

The factors relating to the characteristics of the request are: (1) its language, (2) its format, and (3) the recipient of the request. *Id.* The factors relating to the characteristics of the records are: "(1) whether the request was for specific records, as opposed to information about or contained in the records," "(2) whether the requested records were actual public records," and "(3) whether it was reasonable for the agency to believe that the requester was requesting the documents under an independent, non-PRA authority." *Id.* at 807 (emphasis omitted).

2.      The PRA request letters satisfy the fair notice test

Here, all three factors related to the characteristics of the request favor O'Dea. The letters were addressed to the Department's public records officer, and each was clearly titled "PUBLIC RECORDS ACT REQUEST." CP at 9-12 (underscore omitted); *see Germeau*, 166 Wn. App. at 805. And, although the requests did not arrive through the City's online PRA submission form,

agencies cannot mandate a particular mode of submission. RCW 42.56.080(2); *Germeau*, 166 Wn. App. at 806 n.17.

Two of the three factors concerning the characteristics of the records clearly favor O'Dea. For the most part, the letters sought specific public records, not information about records. *See Germeau*, 166 Wn. App. at 807. O'Dea asked for documents relating to Department investigations, deadly force review board incidents, claims for damages, policies and procedures, training directives, personnel rosters, and other internal communications, all public records that the City possessed.

Whether it was reasonable for the City to believe O'Dea requested documents under an independent, non-PRA authority, is a closer question but still favors O'Dea. Although the City received the letters as attachments to a complaint, when read in context with the substance of the complaint, it was obvious that the plaintiffs had already attempted to submit these letters as public records requests. The complaint explicitly referenced the attached letters and stated that Purtzer mailed two "Public Disclosure Request[s] to the . . . Department" and "[n]o response was ever received." CP at 18. O'Dea's complaint asked the trial court to "order that all records requested . . . be provided promptly." CP at 21. Regardless of whether the original letters were lost in the mail or somehow misplaced, O'Dea's complaint made clear that he sought public records and he was awaiting a response to the PRA request letters. And the City could not reasonably have believed O'Dea sought the records under an independent non-PRA authority, given that both letters expressly referenced the PRA. *See Germeau*, 166 Wn. App. at 807.

To the extent the City argues that the way it received the PRA request letters attached to a complaint made them ambiguous, no authority limits the context under which a PRA request may

be received, so long as the request provides fair notice, which these letters clearly did. Although the City argues its attorney could not have treated the attachments as PRA responses without abdicating her duty to defend her client, we disagree. She could simultaneously argue the City did not receive the letters until it received the complaint and instruct the City to respond to the letters as PRA requests as soon as it received them. In fact, starting the PRA response, rather than waiting nine months for confirmation of something the City already knew—that O'Dea was seeking these records under the PRA—was the only reasonable course.

Even so, the City attempted to clarify whether O'Dea wanted to treat the letters as PRA requests in July 2018 but received no response from O'Dea until August 2018. O'Dea's failure to respond to the request for clarification, while it does not absolve the City from penalties for its delayed response, should have been a mitigating factor for penalty purposes.

We affirm the trial court's ruling that the City violated the PRA by not treating the PRA request letters as PRA requests when it received them in November 2017, regardless of whether they arrived as complaint attachments. We also affirm the denial of the City's motion for reconsideration.

3.     The City's answer to the complaint did not satisfy its PRA obligations

The City suggests that it received the PRA request letters while the parties were "in a litigation mode," so its only duty was to comply with the civil rules and answer the complaint. Wash. Court of Appeals oral argument, *O'Dea v. City of Tacoma*, No. 53613-7-II (May 20, 2021), at 8 min., 0 sec to 8 min., 40 sec. (on file with court). The City also contends that its answer to the complaint amounted to a denial of the requests, and the City had no further obligation to respond. We reject these arguments. No authority supports the proposition that complying with the civil

rules excuses an agency from fulfilling an independent duty to respond under the PRA. Here, although the City properly responded to O'Dea's complaint by denying that it had received the PRA request letters prior to November 2017, this did not discharge its duty under the PRA to respond to the PRA requests once it did receive them.

Moreover, even if we were to interpret the City's answer to the complaint as a denial of any PRA requests received in November 2017, as the City encourages us to do, the City would not be protected from penalties. It is true that "[d]enying the public record request" is one acceptable response to a PRA request under RCW 42.56.520(1)(e), but "[d]enials of requests must be accompanied by a written statement of the specific reasons therefor." RCW 42.56.520(4). "An agency must explain and justify any withholding, in whole or in part, of any requested public records. Silent withholding is prohibited." *Resident Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 432, 327 P.3d 600 (2013) (citations omitted). The City's answer did not meet these requirements for establishing a clearly-stated denial of the public records requests including a statement of reasons for the denial.[3]

In sum, the trial court did not err when it granted partial summary judgment to O'Dea, concluding that the City violated the PRA when it failed to begin responding to the PRA request letters as soon as it received them in November 2017 as attachments to the complaint.

C.    Penalty Award for the Two PRA Request Letters

The City received the PRA request letters as complaint attachments in November 2017 but did not begin responding until August 2018. For the delay in responding to the two PRA request

---

[3] To the extent the City argues that its failure to respond to the PRA request letters between March and November 2017 also amounted to a denial that effectively closed the request, this reasoning also applies. There was no clearly-stated denial of the two PRA request letters.

letters, the trial court imposed penalties of more than $2.6 million. In February 2019, the trial court imposed an initial penalty of $1,731,280. In June 2019, the trial court entered an additional $837,160 in penalties for subsequent installments not accounted for in the February 2019 order. The trial court applied a *per record* multiplier in both orders. The total penalty was $2,607,940, not including attorney fees.

The City claims the trial court's penalty award was an abuse of discretion. The City argues the trial court should not have imposed penalties between November 2017, when it received the complaint, and August 2018, when O'Dea's counsel confirmed that the City should treat the letters attached to the complaint as PRA requests. The City also contends that the trial court erred by imposing additional penalties worth more than $800,000 in its June 2019 order, in addition to the $1.7 million in its February 2019 order. The City argues that the Y*ousoufian* factors do not support a $2.6 million penalty in this case. Although trial courts generally have broad discretion in setting public record penalties, we agree with the City that the more than $2.6 million penalty was an abuse of discretion.

The trial court has discretion to impose penalties for violations "not to exceed one hundred dollars for each day that [the requester] was denied" access to the public record. RCW 42.56.550(4). In *Yousoufian*, the Washington Supreme Court "set forth a nonexclusive list of aggravating and mitigating factors, including agency bad faith, to guide trial courts as they exercise discretion." *Hoffman*, 194 Wn.2d at 219. "[T]he factors may overlap, are offered only as guidance, may not apply equally or at all in every case, and are not an exclusive list of appropriate considerations." *Yousoufian*, 168 Wn.2d at 468. No single factor controls, and the factors

themselves "should not infringe upon the considerable discretion of trial courts to determine PRA penalties." *Id.*

"We holistically review the overall penalty assessment for abuse of discretion." *Hoffman*, 194 Wn.2d at 229. We do not perform "piecemeal de novo review of individual *Yousoufian . . .* factors." *Id.* at 228. "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons." *Yousoufian*, 168 Wn.2d at 458.

Here, the trial court concluded the City's explanation that it did not receive the initial mailed copies of the PRA request letters was reasonable. Therefore, the trial court did not impose penalties until the City received the requests as attachments to the complaint in November 2017. For the period after the City received the requests, the trial court found three aggravating factors: O'Dea's request was time sensitive, "[t]he City's explanation for noncompliance [was] unreasonable," and a large penalty was necessary to deter future misconduct. CP at 585. For the request letter originally dated March 24, 2017, the trial court multiplied "(11/13/2017 to 12/13/2018 for a total of 395 days) is 395 x 10 documents x $10/day for a total of $39,500." *Id.* For the request letter originally dated March 28, 2017, the trial court multiplied "(11/13/2017 to 10/2/2018 for a total of 323 days) is 323 x 536 documents x $10 per day for a total of $1,731,280." *Id.* In a second order in June 2019, the trial court entered additional *per record* penalties for 180 records responsive to the March 24, 2017 letter, plus an additional $63,360 for 12 records responsive to the March 28, 2017 letter.

The trial court reached its more than $2.6 million total penalty by applying a *per record* multiplier to a total of more than 700 records. O'Dea points to no case holding that a multiplier is required under the PRA, and we are aware of none. The Supreme Court has allowed a per record

or per page multiplier, but it has also endorsed grouping documents together and then imposing per day penalties for each group if a multiplier is necessary for deterrence. *Wade's Eastside Gun Shop, Inc. v. Dep't of Labor & Indus.*, 185 Wn.2d 270, 277-80, 372 P.3d 97 (2016).

A *per record* multiplier imposed in the context of a large public records request can lead to extreme penalty amounts, as it did in this case where the total response involved more than 700 records. Even at the relatively low penalty rate of $10 per day, a per record multiplier means the City was charged more than $7,000 per day for some days in the penalty period when all 700 plus records were outstanding.

We cannot lose sight of the fact that public records penalty awards are ultimately paid with taxpayer dollars. For example, the Supreme Court has discussed the amount per resident a penalty represents for a jurisdiction. *Hoffman*, 194 Wn.2d at 232. In *Hoffman*, the court noted total penalty awards that amounted to $0.34 and $0.19 per resident where small cities were the defendants. *Id.* In comparison, here the more than $2.6 million penalty amounts to almost $12 for each of Tacoma's approximately 220,000 residents, an amount more than 35 times higher than the per-resident amount approved in *Hoffman*.

Such an extreme per record multiplier should be justified with a robust explanation for the severity of the penalty. And such large per record multipliers should be reserved for the most extreme cases, for example, those involving a bad faith withholding of a record subject to intense public interest. In *Yousoufian*, where the Supreme Court held that the trial court abused its discretion by imposing too low of a daily per record penalty, the agency engaged in years of delay, misrepresentation, and "grossly negligent noncompliance." 168 Wn.2d at 463. Even under the egregious facts in *Yousoufian*, the ultimate overall penalty was just over $370,000, and amounted

to $0.19 per resident. *Id.* at 470; *Hoffman*, 194 Wn. App at 232. "[M]ost penalty awards against jurisdictions in PRA cases rarely exceed more than a few dollars per resident on a per capita basis." *Zink v. City of Mesa*, 4 Wn. App. 2d 112, 128, 419 P.3d 847 (2018).

In *Wade's*, the Supreme Court affirmed a more than $500,000 total penalty based on a daily penalty multiplied by thousands of records. 185 Wn.2d at 276-78, 288. The court emphasized the trial court's discretion to impose per record multipliers, but the PRA violations described in that case were more egregious, the request was one involving media interest and public safety, and the trial court specifically discussed how the agency's conduct supported the penalty award. *See, e.g.*, *id.* at 276, 285-86, 291, 293, 295-96.

The $502,827 penalty in *Wade's*, one of the highest recent PRA penalties in this state, was less than one fifth of the $2.6 million penalty in this case. *Id.* at 276.[4] And although the trial court in *Wade's* imposed a per record multiplier to a large number of records, the trial court kept the total penalty amount within reason by setting the daily per record penalties at only a few cents for the vast majority of the records at issue. *Id.* at 285, 288, 291. The highest daily per record penalty was $5, which applied only to records the agency had compiled and yet continued to withhold even after the court ordered them to be produced, and some of which the agency did not provide until the requester threatened a contempt motion. *Id.* at 295-96. Finally, because the Department of Labor and Industries is a statewide agency, the per capita taxpayer burden in *Wade's* was dramatically lower than in this case.

---

[4] As of 2018, the more than $502,827 penalty in *Wade's* appeared to be the highest total PRA penalty on record in Washington State. *Zink*, 4 Wn. App. 2d at 128 n.9.

Here, the trial court imposed per record penalties based on minimal discussion, a total of five sentences, mentioning three aggravating factors. The trial court did not include any discussion of why mitigating factors did not apply, nor did it say why the circumstances of this case were particularly egregious. The trial court did not find any bad faith.

Reviewed holistically, this more than $2.6 million penalty was an abuse of discretion because the overall amount was manifestly unreasonable, especially in light of the trial court's lack of supporting explanation. While we do not do a piecemeal review of the *Yousoufian* factors and they are not to be applied rigidly, the trial court here found only three aggravators and no bad faith, which was not enough to justify the astoundingly high penalty. Although deterrence is a permissible goal when setting public record penalties, and the need for deterrence could justify a multiplier, a far more reasonable course would have been to multiply the per day penalty by the number of days and by the number of requests, or by grouping the records for penalty calculation purposes in another way to achieve a more reasonable multiplier. As a result, we remand for recalculation of the public record penalty.

D.      Issues Relating to Setting the Penalty Period

The City also argues that the trial court erred in setting the penalty period. Because the trial court must address the penalty period on remand when revisiting the appropriate penalty, we address the onset of the penalty period and the trial court's discretion in setting penalties during the time the City was diligently gathering and producing records.

1.      Onset of penalty period

The City argues that no penalties should have been imposed between November 13, 2017 and August 24, 2018, because it was not until August that Purtzer clarified that the City should treat the letters attached to the complaint as PRA requests. We disagree.

Because the City did not seek clarification from Purtzer until July 2018, even though it received the complaint in November 2017, the City should not be absolved from all penalties for its failure to act on the PRA request letters until it sought clarification in July 2018. Nonetheless, O'Dea's failure to bring a show cause motion or respond to the City's request for clarification should be a significant mitigating factor in favor of the City. The trial court should take these facts into account when recalculating penalties on remand.

2.      Penalties for the time period when the City was diligently responding

The City contends that the additional over $800,000 penalty imposed for its ongoing response in installments to the March 24, 2017 PRA letter request was an abuse of discretion because the PRA permits an agency to provide records in installments, and O'Dea had no cause of action "until the City has completed its last production." Br. of Appellants/Cross Resp'ts at 42.

As an initial matter, we reject the City's contention that no cause of action accrued at all until the City closed its response in February 2019. O'Dea was entitled to claim a PRA violation for an unreasonably delayed response when the City failed to timely respond to the PRA requests attached to the complaint. *See* RCW 42.56.100; *see also Andrews v. Wash. State Patrol*, 183 Wn. App. 644, 652-54, 334 P.3d 94 (2014) (acknowledging that RCW 42.56.100 requires the agency to act in a timely, thorough, and diligent manner).

Nevertheless, under the PRA, the penalty period is "each day that [the requester] was denied the right to inspect or copy" the requested public record. RCW 42.56.550(4). An agency may respond by providing a reasonable estimate of the time required to respond to the request, and it may require additional time to respond to a request based on the need to locate and assemble the requested records. *See* RCW 42.56.520(1)(c), (2). In addition, although there was an unreasonable preresponse delay in this case, in more typical circumstances, a cause of action for denial of the right to inspect a public record under the PRA does not normally accrue until "the agency has taken final action and denied the requested records." *Hobbs v. Wash. State Auditor's Office*, 183 Wn. App. 925, 941, 335 P.3d 1004 (2014).

These provisions of the PRA and *Hobbs* support a conclusion that a requester is not denied their right under the PRA to inspect or copy the requested record during the time when the agency is diligently responding. Indeed, we are aware of at least one instance where we approved subtracting a number of days from the penalty period during a reasonable amount of time when an agency was gathering and processing responsive records in a situation similar to this case.[5]

Thus, even in situations like this one where a requester claims that an agency has taken an unreasonable amount of time to initiate its response to a public records request, the language of the PRA allows a $0 per day penalty during any reasonable amount of time that the agency takes to gather records and respond to the request.

Here, once the City began responding, it was entitled to a reasonable amount of time to process its response to O'Dea's two PRA letter requests. Once the requests were sent to Anderson for processing, the trial court never found that the City's estimated completion date was

---

[5] *West v. Gregoire*, noted at 170 Wn. App. 1029, 2012 WL 5348107, at \*2-\*4.

unreasonable. Between December 13, 2018 and February 21, 2019, the City provided 187 documents in five installments before closing the request on February 21, 2019, which was ahead of both its own estimate and the 30-day deadline the trial court set in its February 6, 2019 order.

A court can impose daily penalties at varying per day rates, daily penalties can be anywhere between $0 and $100 under RCW 42.56.550(4), and the time necessary to diligently locate and assemble the requested records should be taken into account when setting penalties on remand.[6] The trial court on remand has discretion to impose a $0 penalty for the days when the City was diligently working on O'Dea's request.

E.      Attorney Fees Below

The City asks this court to reverse the trial court's attorney fees award in favor of O'Dea. Because we affirm the partial summary judgment order regarding the PRA request letters in O'Dea's favor, O'Dea is still entitled to some attorney fees below. But the amount may change based on the trial court's reconsideration of the penalties on remand. Thus, on remand, the trial court should also reconsider the amount of attorney fees in light of this opinion.

CONCLUSION

In sum, the trial court properly concluded that the City violated the PRA when it failed to respond to the two PRA letter requests when it received them as attachments to O'Dea's complaint. But the trial court abused its discretion by imposing a per record multiplier without offering sufficient explanation supporting the resulting extreme penalty. On remand, the trial court must

---

[6] The City also contests the total number of records ultimately produced and subjected to penalties. We do not determine the precise number of records produced because we reverse the per record multiplier. Because we are remanding for the trial court to recalculate penalties, we need not address any other arguments raised regarding the penalty amounts.

22

recalculate penalties and attorney fees. We resolve the remaining issues in the unpublished portion of this opinion.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Unpublished Text Follows

## II.  ADEQUATE SEARCH FOR LATER-DISCLOSED RECORDS

The City contends that the trial court abused its discretion by adding $63,360 in penalties for 12 additional training directives that the City found when it searched an old computer hard drive because there was no nonspeculative evidence that the City's original search was inadequate. We agree.

### A.    Additional Facts

After closing its response to the PRA request letters, the City discovered additional responsive records that it had inadvertently missed in its original searches. Michael Smith, the City attorney who oversaw the Department's PRA response, stated in a declaration that the training unit produced "hundreds of pages of records which were responsive" to the request for training directives. CP at 554. Jon Verone, a sergeant in the training section, recalled conducting the search with two other staff members and explained that they searched "the Training Drive, and the Skills Manager database, where Training Directives are most likely to be found," using search terms "'Training Directives'" and "'use of force.'" CP at 564. Verone also noted that typically, training directives prior to 2014 would no longer exist because the Department purged them every three years.

Verone further explained that his staff found the additional 12 training directives later when they located and searched an old computer drive that had not been used since 2010. Verone explained that after reviewing O'Dea's declaration in which he alleged various training directives were missing, Verone instructed his staff to search again "in a good faith effort to ensure that we had produced everything." CP at 885. One of his staff members "located additional training directives on the old common drive server." *Id.* The old drive had not been used to store training directives since 2010, and Verone "believed that any Training Directives would have been transferred to our current systems and any Training Directives on the shared drive were believed to have been purged." *Id.* Similarly, Smith stated that the old drive was not housed in the "location used by the Training Section for business purposes anymore. Unfortunately, even as Tacoma Police continues to update its computer systems and databases, the old network drives are apparently not deleted. I do not know why records were still maintained in that drive, or who maintained them." CP at 889.

## B.     Adequate Search Legal Principles

The failure to locate and produce a record is not a per se violation of the PRA. *See Block v. City of Gold Bar*, 189 Wn. App. 262, 274, 355 P.3d 266 (2015). The touchstone is instead the adequacy of the agency's search. *Id.* "[T]he mere fact that a record is eventually found does not itself establish the inadequacy of an agency's search." *West*, 12 Wn. App. 2d at 79.

The adequacy and reasonableness of a search depends on the specific facts of the case. *Id.* An agency's "search must be reasonably calculated to uncover all relevant documents." *Neigh. All.*, 172 Wn.2d at 720. Even so, the agency need not "search *every* possible place a record may conceivably be stored, but only those places where it is *reasonably likely* to be found." *Id.* Courts

consider "the scope of the agency's search as a whole and whether that search was reasonable, not whether the requester has presented alternatives that [they] believe[] would have more accurately produced the records [they] requested." *West*, 12 Wn. App. 2d at 79. "[A]gencies are required to make more than a perfunctory search and to follow obvious leads as they are uncovered." *Neigh. All.*, 172 Wn.2d at 720.

An agency bears the burden of showing its search was adequate beyond material doubt. *Id.* at 721. "To do so, the agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith. These should include the search terms and the type of search performed, and they should establish that all places likely to contain responsive materials were searched." *Id.* "Purely speculative claims about the existence and discoverability of other documents will not overcome an agency affidavit, which is accorded a presumption of good faith." *Forbes v. City of Gold Bar*, 171 Wn. App. 857, 867, 288 P.3d 384 (2012).

C.     City's Search for Training Directives

To the extent the trial court concluded that the discovery of additional responsive documents alone "support[ed] a finding that the City's prior search in response to the March 28, 2017 request was inadequate," this contradicts the principle that the discovery of records does not alone establish inadequacy. CP at 1114; *West*, 12 Wn. App. 2d at 79.

The City presented reasonably detailed, nonconclusory, good faith declarations establishing that its original search was adequate. The City's declarations are sufficient to establish that although the City discovered additional training directives after its initial search, it found them in a location that was not reasonably likely to contain responsive records. *See Neigh. All.* at 720.

We reverse the trial court's conclusion that the discovery of the additional training directives reflected a previously inadequate search. The trial court on remand must not impose penalties for the late disclosure of these records.

### III. O'DEA'S CROSS APPEAL

O'Dea cross appeals the October 2018 order granting the City's motion for partial summary judgment and dismissing O'Dea's claims other than those related to the PRA letters. O'Dea also cross appeals the June 2019 findings of fact and conclusions of law to the extent the trial court denied his motion for additional searches and did not address the destruction of documents.

### A. Other Requests

O'Dea argues that the trial court erred when it granted the City's motion for partial summary judgment and dismissed his claims based on requests for policies and procedures, captain's assessment materials, O'Dea's own finance records, and oral requests for firearm training sign-in sheets and training directives. We disagree because none of these requests provided fair notice under the PRA.

#### 1. Additional facts

While on administrative leave, O'Dea could not access Department facilities or records, but he was assigned Department contacts and afforded procedural rights under Department policies, including the right to "access . . . all materials supporting the proposed [disciplinary] action." CP at 378. As a union member, O'Dea was also protected by the union's collective bargaining agreement. O'Dea was represented by counsel throughout the investigation, initially by the union attorney and then by independent counsel, Purtzer.

Between August 2016 and June 2017, O'Dea communicated frequently with his designated Department contacts, union contacts, and other Department employees. O'Dea requested documents from the Department, including policies and procedures, materials related to a test for officers applying to be captains, firearm training sign-in sheets, and training directives. O'Dea never mentioned the PRA in any of these requests. O'Dea also contacted staff in the finance department to cash out his accrued leave time. The finance manager told O'Dea how much leave time he was entitled to cash out and provided the City's form for requesting a one-time payout. The City denied that these communications were PRA requests and said it had already provided much of the material he sought.

### 2. The fair notice test

Here again, we must apply the fair notice test described above in the published portion of this opinion to determine whether O'Dea's other requests were actually requests under the PRA. In *Germeau*, the plaintiff's request for documents did not pass the fair notice test because it could reasonably have been a request for documents under the plaintiff's collective bargaining agreement instead of the PRA. 166 Wn. App. at 805, 810. Germeau was a union representative who requested documents on behalf of another officer who believed they were the subject of an internal investigation. *Id.* at 793-94. Germeau submitted a letter to the sheriff's office, identifying himself as the officer's union representative and instructing the sheriff's office to communicate with him about any internal investigation. *Id.* at 806. Germeau's letter also requested documents relating to any investigation the sheriff's office may have been conducting. *Id.* at 806-07.

In applying the fair notice test, we held that the language of the request favored the agency and was a determinative factor. *Id.* at 805-07. Germeau's "language indicated that the purpose of

[his] request for notes, e-mails, memos, and findings was to become privy to any investigation" of the officer, not to request records under the PRA. *Id.* at 807. Likewise, we held it was "[m]ost important" that "the letter's language strongly suggested that the collective-bargaining agreement entitled Germeau (in his capacity as guild representative) to the requested records or, at the very least, that Germeau was making the request in such a capacity, not as a PRA request." *Id.* at 808. We agreed with the County that "'The Guild ha[d] a right [under RCW 41.56.030(4)'s definition of "collective bargaining"] to . . . information from the Sheriff's Office to . . . represent its members in internal affairs investigations.'" *Id.* (alterations in original) (quoting respondent's brief). We emphasized that the character of the records was ambiguous and "it was reasonable for the County to have believed that Germeau's letter requested documents under the collective-bargaining agreement rather than under the PRA." *Id.* at 810.

In *Wood*, the plaintiff "was a current, but soon-to-be-terminated, employee seeking access to her file to find out why she was being forced out of her job." 102 Wn. App. at 880. Wood sent a letter to the prosecuting attorney's office seeking information about her impending termination and authorization for the agency to provide her personnel file. *Id.* at 874-75. Division Three recognized that "[o]rdinarily, a request for documents within a public employee's personnel file falls within the scope of the [PRA]." *Id.* at 879. But in *Wood*, "[n]either the letter nor the authorization indicated" that Wood was making a public records request. *Id.* at 875. Division Three explained, "Wood's general request for her [own] personnel file was not a request for an identifiable public record as contemplated under the [PRA]." *Id.* at 880. It held that "the trial court correctly noted the ambiguity in . . . Wood's blanket letter; her request could be reasonably interpreted as falling under" the personnel file statute, RCW 49.12.250(1). *Id.*

28

Applying the fair notice factors, we conclude that O'Dea's remaining requests did not give fair notice that they were intended to be public records requests.

### 3. Characteristics of O'Dea's requests

Here, as in *Germeau*, the language of the request is the most important factor in this category. 166 Wn. App. at 805-06. This factor weighs against O'Dea.

O'Dea never expressly requested records under the PRA when he communicated the requests at issue to the Department. Instead, he emphasized his need to defend himself against the Department's investigation and to participate in the captain's test. O'Dea explained, for example, that he needed the Department's policy and procedure manual "to properly defend myself," and he requested policies and procedures relating to the specific policies the Department alleged he violated. CP at 98. O'Dea also requested the policy and procedure manual to prepare for the captain's assessment. And when O'Dea requested other test-related materials, including a memo announcing the exam and a document identifying Department goals, he again referenced only his need to prepare for the exam and specifically invoked his "rights under the city's Civil Service Rules." CP at 112.

The remaining two factors, the format and recipient of the requests, also weigh in favor of the agency, although we give them minimal weight. *See Germeau*, 166 Wn. App. at 806 n.17. O'Dea did not use the City's online PRA submission form. This alone would not render a PRA request invalid because there is no required PRA request format, but because the language of the request also did not reference the PRA, the format of O'Dea's communications did not suggest that he sought records under the PRA. *See id.* Likewise, O'Dea did not address his requests to the City's public records staff, which did not "render his claim fatal," but also did not signal that he

was making a PRA request. *Id.* Taken together, the characteristics of O'Dea's request did not provide fair notice to the City that O'Dea was requesting materials under the PRA. *See id.*

4.        Characteristics of the requested records

Following *Germeau*, the most important factor in this category is whether the City could reasonably have believed that O'Dea sought documents under an independent, non-PRA authority. *Id.* at 807-08. This factor weighs against O'Dea.

Here, as in *Germeau*, the police union had a collective bargaining agreement with the City that covered O'Dea's employment and guaranteed various procedural rights in the event of a disciplinary proceeding. *See id.* at 809-10. Indeed, the City's personnel management policy for covered employees, including O'Dea, provided that an employee subject to a predisciplinary proceeding, "will have access to all materials supporting the proposed action and, if requested, he/she will be supplied with a copy of such material." CP at 378. O'Dea thus had statutory and contract rights to information about the investigation.

According to O'Dea, none of the items he requested was contained in his personnel file, meaning that his request could not have been reasonably interpreted to fall under any other non-PRA authority. But the City provided numerous declarations from employees who interacted with O'Dea during his administrative leave. None of these employees believed O'Dea's requests for information or documents, other than the two clear PRA request letters, arose under the authority of the PRA. With regard to any other materials related to the investigation, such as the policy and procedure manual, these assumptions were reasonable given O'Dea's rights under the collective bargaining agreement and City personnel policies. Likewise, the City reasonably construed O'Dea's requests for test preparation materials as arising from an independent employment right

to equal treatment rather than a PRA request, especially because he emphasized his right to participate in promotion opportunities and never mentioned the PRA.

O'Dea's inquiries about cashing out his leave time were mostly requests for information and not identifiable records, so did not invoke the PRA. *Bonamy v. City of Seattle*, 92 Wn. App. 403, 409, 960 P.2d 447 (1998). And to the extent O'Dea requested records about his leave time, the City could reasonably have inferred that O'Dea did so under RCW 49.12.250(1), under which employees may access their own personnel file. *See Wood*, 102 Wn. App. at 880.

Finally, O'Dea alleges that he verbally requested copies of the Department's firearm training sign-in sheets and training directives during his internal investigation interview in January 2017. Oral requests for records are less likely to pass the fair notice test because "orally requesting public records makes it unnecessarily difficult for citizens to prove that they in fact requested public records." *Beal v. City of Seattle*, 150 Wn. App. 865, 874-75, 209 P.3d 872 (2009). An employer is entitled to treat an ambiguous request for documents by a current employee covered by a collective bargaining agreement and facing an investigation as a request under the collective bargaining agreement, not the PRA. *See Germeau*, 166 Wn. App. at 808-10. We hold that O'Dea's request for firearm training sign-in sheets and training directives did not trigger a duty under the PRA.

The other two factors, whether O'Dea sought only information or identifiable records and whether any records he sought were in fact public records, slightly favor O'Dea but do not outweigh the other factors. *See id.* at 807. Many of O'Dea's communications did refer to identifiable records that were in fact public records, such as the policy and procedure manual and intradepartmental memoranda. But other communications, such as his inquiries and complaints

about scheduling the captain's test and cashing out leave time, sought *information* and were not requests for actual public records. As a whole, the characteristics of the records O'Dea purportedly requested did not reasonably put the City on notice that O'Dea sought records under the PRA. *See Id.* at 807-08.

In sum, none of O'Dea's communications with the Department while on administrative leave, except the PRA request letters, provided fair notice to the City that O'Dea was requesting records under the PRA. We affirm the trial court's summary judgment order dismissing O'Dea's claims except those arising from the PRA request letters discussed above.

B.     Trial Court's Refusal to Order Additional Searches

O'Dea argues that the trial court erred by denying his motion to compel additional searches in its June 2019 order. We reject this argument.

O'Dea offered a declaration in which he described hundreds of additional documents he believed should have existed. In particular, O'Dea asserts that the City's search was inadequate because it did not produce various records from the 1990s and early 2000s. O'Dea also relies on his own recollection of Department record keeping practices to describe documents he believed should have existed and should have been included in the City's responses.

The City, on the other hand, provided declarations from six Department employees who responded to each of O'Dea's allegations about missing documents. Frequently, they stated that records for older time periods no longer existed due to retention schedules. The City also provided sworn statements establishing it searched the places responsive records were reasonably likely to be found and produced the records it discovered. When the trial court denied O'Dea's motion to

compel additional searches in June 2019, the City had produced over 700 documents after nine searches.

O'Dea also argued below that the City erred by not producing full claim files for claims for damages against the Department. But his counsel had previously agreed to a modified request for Excel spreadsheets tracking such claims. After the City provided its first installment of records, Anderson spoke with Purtzer about his request for claims for damages against the City. Anderson explained that because there were hundreds of claim files, it could take up to a year to fully respond if he wanted the contents of every file. Purtzer and Anderson agreed that the City would instead provide "an Excel spreadsheet relating to police-related claims," and Purtzer could request specific files in their entirety. CP at 864-65. Purtzer never requested specific claim files, so the City considered its response to this portion of the request complete when it provided the Excel spreadsheet a few days later. O'Dea acknowledges he received those spreadsheets.

And to the extent O'Dea sought "[d]ata" about training directives beyond what the training directive itself contains, he offered no nonspeculative evidence that such data existed as an *identifiable public record*. *See, e.g.*, CP at 726-27. The City was not obligated under the PRA to create a record by mining data and creating a new document. RCW 42.56.010(3), (4); *see also Fisher*, 180 Wn.2d at 523-24.

In sum, the trial court properly denied O'Dea's motion to compel additional searches because the PRA does not permit indiscriminate sifting through the Department's files for additional records he claimed should have existed. *See Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 734-35, 218 P.3d 196 (2009). The City's reasonably detailed, nonconclusory,

good faith affidavits reflect an appropriate search, and the trial court did not abuse its discretion when it denied O'Dea's request to order additional searches.

C.      Trial Court's Failure to Address Destruction of Documents

O'Dea claims the trial court erred by failing to address the City's destruction of documents between November and December 2018. O'Dea suggests the trial court erred by failing to assign bad faith to the City's destruction of records, but he does not claim it should have supported an additional PRA violation or penalties.

In November 2018, the City accidentally purged six documents from a database. But O'Dea only speculates that the City destroyed any records to avoid producing them in response to his PRA requests. The trial court properly declined to find the City acted in bad faith on the basis of any inadvertent record destruction. We do not condone destruction of responsive records while a request is pending, but the only thing O'Dea challenges is the lack of a bad faith finding. This record does not support a finding of bad faith.

IV. ATTORNEY FEES ON APPEAL

O'Dea requests attorney fees on appeal under RAP 18.1(a) and (b) and RCW 42.56.550(4). Under RCW 42.56.550(4), a PRA requester who prevails against the agency is entitled to attorney fees. Our commissioner may determine whether fees can be segregated at this level and, if so, what portion is attributable to the arguments relating to the partial summary judgment order in favor of O'Dea, on which he has prevailed on appeal.

CONCLUSION

We reverse the trial court's penalty award and remand for recalculation of penalties and attorney fees in accord with our decision, but we otherwise affirm the trial court's conclusion that

the City violated the PRA by not responding to the PRA requests attached to the November 2017 complaint when it received them. We affirm the trial court's summary judgment ruling in favor of the City dismissing O'Dea's other claims and award attorney fees to O'Dea on appeal for the work performed on his prevailing argument.

Glasgow, A.C.J.

We concur:

Sutton, J.

Veljacic, J.